THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SHARLENE WILBURN, Defendant-Appellant.

First District (6th Division)   No. 1—92—2206

Opinion filed May 20, 1994.—Rehearing denied June 15, 1994.

Rita A. Fry, Public Defender, of Chicago (Bruce C. Landrum, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Linda Woloshin, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McNAMARA delivered the opinion of the court:

Following a jury trial, defendant, Sharlene Wilburn, was convicted of the second degree murder of Maurice Johnson (Ill. Rev. Stat. 1989, ch. 38, par. 9—2) and was sentenced to the maximum term of 15 years. On appeal, defendant contends that: (1) the trial court erred by refusing to instruct the jury on the defense of justifiable use of force to prevent a forcible felony; (2) the State failed to disprove self-defense beyond a reasonable doubt; (3) the trial court erred in allowing testimony concerning weapons that were not connected to the murder; (4) she was deprived of a fair trial due to several improper remarks made by the prosecutor in closing argument; and (5) her sentence was excessive.

The relevant facts are as follows. On June 21, 1991, at approximately 11:30 p.m., defendant stabbed and killed the deceased inside the apartment building in Chicago where they both resided. The deceased was the boyfriend of Jocelyn Hindmon. The two lived together in a first-floor apartment. Jocelyn was the sister of Harold Hindmon, who was defendant's fiance. Defendant and Harold lived together, along with defendant's daughter, in an apartment on the third floor. Defendant had known Jocelyn and Harold for approximately 20 years, and the deceased for three or four years.

Jocelyn testified for the State that at approximately 6 p.m. on the date in question, her brother Harold came home with a case of beer and asked her and the deceased to his apartment for a drink. Jocelyn and the deceased went and began drinking beer and gin with Harold and defendant. A few hours later, Jocelyn and defendant started arguing and Harold intervened. Jocelyn began fighting with Harold and at some point was "knocked out." When she awoke, she

was sitting on the living room floor in Harold's arms. Jocelyn arose, still dazed and slightly drunk, and went downstairs to her apartment, where she found the front door open and the lights on. No one was inside. She went across the hall to an apartment occupied by Evelyn Davis. Jocelyn asked Davis where the deceased was, and Davis told her about the stabbing. Jocelyn had never seen the deceased carry a gun, nor did he keep one in their apartment.

On cross-examination, Jocelyn acknowledged having had the deceased arrested in 1989 for battery. On redirect examination, she testified that she had been arrested at the same time as the deceased on the same charge. Both cases were subsequently dismissed. According to Jocelyn, the deceased never hit her, her children, or defendant.

Harold testified for the State that he had known the deceased for four or five years. On the date in question, he came home with a case of beer, and the deceased and Jocelyn invited themselves to his and defendant's apartment. The four began drinking gin and beer. Harold denied that any arguments occurred, but stated that the deceased became upset with Jocelyn for refusing to leave the apartment. The deceased left and defendant then left and went to a friend's house.

Harold stated that the police came to the apartment twice that evening, and both times the four were present. Harold denied punching Jocelyn and knocking her unconscious, but stated that at some point he held her in his arms on the floor. Harold did not see the deceased with a gun or any other type of weapon on the evening in question. At some point that evening, Davis came to his door and after four or five minutes left.

On cross-examination, Harold recalled arguing with Jocelyn about her moving to Michigan. According to Harold, the deceased and Jocelyn fought numerous times, and many of the fights were physical in nature. On one occasion, the deceased cut Jocelyn on her arm with a knife, and defendant, although not present during the fight, observed the wound.

Josef Hindmon, Jocelyn's 12-year-old son, testified for the State that at approximately 8 p.m. he entered the apartment building and saw defendant carrying a five-inch-long hatchet knife and an eight- or nine-inch-long butcher knife. Shortly thereafter, the police arrived and took the knives from defendant. Defendant and some of the police officers then went upstairs to her apartment. Josef followed the police to the apartment, where he saw his mother lying on the floor and Harold trying to waken her. The apartment was "messed up," with pieces of wood and broken glass all over.

After the police left, Josef returned to his apartment on the first

floor. He then went across the hall to Davis' apartment. Davis lived there with a man named Tommy Smith. Inside, the deceased was lying on a bed holding an icebag to a cut on his forehead. Josef did not see a gun in the deceased's waistband. Defendant then entered the back door of Davis' apartment, went into the kitchen and picked up a six- or seven-inch-long steak knife. Defendant left the apartment and about two minutes later returned. Defendant entered the apartment with the knife still in hand. Defendant "started making stab motions over [Smith's] head and she was saying [to the deceased], 'I'm going to kill your punk ass. Watch. I'm going to kill your punk ass.' " The deceased got up from the bed and said, "I'm tired of this bitch." He left through the back door and defendant left through the front door.

The next thing Josef heard was the deceased yell from the hallway, "Oh, she stabbed me." Josef ran into the hallway and saw the stab wound in the deceased's chest. The deceased did not have anything in his hands; Josef saw no gun in the vicinity. The deceased staggered over to Davis' apartment and pushed open the door. Defendant was not in the hallway. Josef then went outside and saw defendant standing with a woman named Debra. Josef heard defendant ask Debra for help, but Debra said no. Defendant was still carrying the steak knife, and Josef noticed blood on it. Defendant started running and when she neared Josef stated, "Shush, Josef. Don't say anything. Shush." Defendant was wiping the knife with her shirt as she ran.

On cross-examination, Josef stated that he did not tell the assistant State's Attorney immediately after the incident that defendant tried to stab the deceased from the doorway of Davis' apartment. Josef told the assistant State's Attorney that Smith talked to defendant in the hallway outside the apartment to keep her and the deceased from arguing. Josef was not in the hallway when defendant stabbed the deceased; he was inside the apartment with Davis and Smith.

Smith testified for the State that at approximately 8:30 p.m. on June 21 the deceased appeared at his back door, bleeding from the forehead. The deceased entered the apartment and Smith and Davis attended to the cut. The deceased then went to lie on the bed. At some point, Josef came over to the apartment, followed shortly thereafter by defendant, who was holding the steak knife. Defendant was upset and started yelling at the deceased. Smith moved defendant into the hallway and tried to calm her down. Defendant never got into the apartment. Smith tried to take the knife from defendant, but she pulled back and cut him on the finger. Defendant was angry.

The deceased then appeared at his doorway. According to Smith,

"a few more words were passed, when they started heading towards each other." Defendant still had the knife in her hand. The deceased did not have anything in his hands. Smith attempted to stop defendant from going any further. At this point, Davis appeared and she and Smith went back into their apartment. A few moments later, the deceased stumbled into Smith's apartment bleeding from the chest. Smith did not see a gun in the deceased's waistband.

Davis testified that she tended to the deceased's head wound, and after placing him on the bed, went to defendant's and Harold's apartment for help. She saw Jocelyn on the floor with Harold holding her. On the way back to her apartment, Davis heard defendant and the deceased arguing in the hallway. She saw the deceased at his doorway with the door cracked; there was nothing in his hands. She walked past defendant and the deceased on the way to her apartment, and then turned around and saw defendant "lunge at [the deceased] with a sharp, shiny object," striking him in the chest. According to Davis, the deceased was still standing in his doorway when defendant came at him. Thinking the wound was not serious, Davis went into the apartment. Smith was pushing her to get in. Seconds later, the deceased stumbled to the apartment, bleeding from the chest.

Davis recalled that the deceased was "a little inebriated" on the evening in question. When he came to her apartment for assistance with the head wound, the deceased was not angry nor did he behave violently. At no time during the evening did Davis see anything in the deceased's hands.

Officer Sandra Napolitano testified for the State that she arrived at the apartment on the evening in question in response to a call and found the deceased leaning against the doorway to Davis' apartment, unconscious. The deceased had sustained a stab wound to his chest and a laceration on his forehead. The deceased had nothing in his hands or waistband, nor were there any objects in the immediate vicinity. Napolitano was informed by witnesses that defendant was the offender, and that she was still somewhere in the building. Subsequently, Napolitano responded to a call that defendant had been apprehended two blocks away. When the officer arrived at that location, she observed that defendant's clothes were spotted with blood. Defendant was then arrested. No knife was found on defendant.

On cross-examination, Napolitano acknowledged that the written police report stated that Davis had not seen the stabbing and that all Davis knew was that there was a knock on her door and the deceased fell into her apartment. Napolitano stated that none of the four witnesses she spoke with immediately after the stabbing, including Davis and Josef, claimed to have seen the stabbing.

Officer Mark Kooistra testified for the State that he apprehended defendant two blocks from the scene. Defendant was carrying no weapons. Kooistra noticed no bruises or other injuries to defendant's body, nor did defendant complain of any. Defendant was 5 feet tall and weighed approximately 129 pounds.

Doctor Eupil Choi performed an autopsy on the deceased and testified for the State that the deceased died as a result of a stab wound to the chest. The deceased was 5 feet 6 inches tall and weighed 130 pounds. A toxicology report indicated that the deceased was intoxicated at the time of his death.

Detective Thomas Benoit testified for defendant that he had a conversation with Josef on the night in question. In this initial conversation, Josef did not tell him that he saw defendant attempt to stab the deceased inside Davis' apartment. Josef told Benoit that he heard the deceased and defendant shortly thereafter arguing in the hallway. Benoit further testified that Davis told him in the initial conversation he had with her that she had not seen the actual stabbing. Davis told Benoit that when she returned from defendant's apartment, the deceased had already been stabbed and was lying in the doorway to her apartment. In a second conversation, Davis told Benoit that she was on her way to her apartment when she saw defendant hit the deceased in the chest with a metal object.

Defendant testified on her own behalf. On the evening in question, Harold came home with a case of beer and some gin. The deceased and Jocelyn came over to her apartment, and the four started drinking. At some point, defendant left and went to a friend's apartment.

After defendant left her friend's apartment, the deceased approached her, grabbed her by the arm and told her to get Jocelyn. No one else was around. When defendant refused to get Jocelyn, the deceased said "he [was] tired of these bitches disrespecting" and slapped her across the face. Defendant slapped him back. The deceased then reached from behind, pulled out a revolver and pointed it at her face. At this point, defendant stabbed him. Defendant testified that she thought the deceased was going to kill her. After she stabbed the deceased, defendant went up to her apartment and told Harold what happened. She then left the building because she was scared.

Defendant did not recall the police taking two knives from her prior to the stabbing, nor did she recall going to Davis' apartment and retrieving a steak knife. She stated that she already had the knife she used to stab the deceased "on her." She stated she pulled it out of her bra, where it had been, in an open position, all day. Defen-

dant could not recall what the knife looked like, nor could she recall cutting Smith's hand with the knife or even speaking with him. She stated that she did not see Davis prior to stabbing the deceased.

Defendant admitted leaving the scene immediately after stabbing the deceased, and could not remember what she did with the knife. She denied telling the police, at the time she was arrested, that she stabbed the deceased three times with a knife because he threatened her with a gun. She also denied telling them that the deceased pulled the gun from his pocket, or that she pulled the knife from her waistband and later threw it in the sewer.

Defendant did not recall seeing or speaking with either Josef or her daughter as she left the apartment building. When the police found her, she did not remember having blood on her clothes.

On rebuttal, Assistant State's Attorney Roger Pena testified regarding the interview he conducted with defendant. Pena stated that defendant never told him that the deceased slapped her before she stabbed him. The State recalled Benoit, who also testified that defendant did not mention a slapping. Defendant told Benoit that after the stabbing, she ran away and threw the knife into a sewer. In their initial conversation, defendant told Benoit that the deceased pulled a gun from his pocket, while in a later conversation, defendant stated the deceased pulled the gun from his waistband.

Defendant first contends that the trial court erred in refusing to instruct the jury as to the defense of justifiable use of force to prevent a forcible felony. At the instructions conference, defense counsel tendered the following instruction:

> "A person is justified in the use of force when and to the extent that she reasonably believes that such conduct is necessary to defend herself against the imminent use of unlawful force.
>
> However, a person is justified in the use of force which is intended or likely to cause death or great bodily harm only if she reasonably believes that such force is necessary to prevent imminent death or great bodily harm to herself *or the commission of a forcible felony*." (Emphasis added.)

(See Ill. Rev. Stat. 1989, ch. 38, par. 7—1.) Accompanying this instruction, counsel tendered an instruction defining the term "forcible felony" and defining the forcible felony he contended was at issue in this case, namely, aggravated battery. Counsel argued that, even ignoring defendant's testimony that the deceased slapped her across the face, the mere assertion by defendant that the deceased grabbed her by the arm while armed with a gun was sufficient to support the instruction. Counsel contended that defendant knew of the deceased's violent tendencies and asserted that she stabbed him

to prevent "great bodily harm" to herself. The trial court rejected counsel's argument and ultimately denied the instructions. The court did, however, instruct the jury as to the defense of justifiable use of force to prevent imminent death or great bodily harm.

A defendant is entitled to an instruction on his theory of the case if there is some foundation for the instruction in the evidence; indeed, it is an abuse of the trial court's discretion to refuse to instruct the jury on defendant's theory where an evidentiary foundation has been laid. (*People v. Crane* (1991), 145 Ill. 2d 520, 585 N.E.2d 99.) Defendant maintains that she believed that the forcible felony of aggravated battery based upon the use of a deadly weapon—a gun—was about to be committed, that this was a question for the jury, and that the "forcible felony" language in the justifiable use of force instruction was warranted.

■ In *People v. Chamness* (1984), 129 Ill. App. 3d 871, 473 N.E.2d 476, this court found meritless the precise argument advanced by defendant here. In *Chamness*, the defendant was convicted of armed violence, aggravated battery and attempted murder. As here, the trial court gave a self-defense instruction, but refused to include the "forcible felony" language. On appeal, this court affirmed, finding that the defendant received the jury's informed consideration of his theory of self-defense, and that any instructional error was harmless. The court wrote:

> "The offenses of attempted murder (Ill. Rev. Stat. 1983, ch. 38, pars. 8—4, 9—1) and aggravated battery (Ill. Rev. Stat. 1983, ch. 38, par. 12—4) each require a level of force which is likely to cause great bodily harm or death. When a jury determines whether a defendant acted to protect himself from great bodily harm or death, it necessarily considers the same evidence which would be involved in a determination of whether that defendant acted to prevent the commission of an attempted murder or aggravated battery upon himself. There is no logic in the suggestion that a jury which found that a defendant was not protecting himself from great bodily harm or death could find that defendant was trying to prevent an attempted murder or aggravated battery from being committed upon himself." (*Chamness*, 129 Ill. App. 3d at 876, 473 N.E.2d at 480.)

The foregoing analysis of the *Chamness* court was adopted in *People v. Hanson* (1985), 138 Ill. App. 3d 530, 485 N.E.2d 1144, and in *People v. Renehan* (1992), 226 Ill. App. 3d 453, 589 N.E.2d 866. Under *Chamness, Hanson* and *Renehan*, we believe that defendant in the present case received the jury's informed consideration of her self-defense theory. As the court in *Chamness* stated, the offense of aggravated battery requires a level of force which is likely to cause great bodily

harm or death. (Ill. Rev. Stat. 1989, ch. 38, par. 12—4. See also Ill. Rev. Stat. 1989, ch. 38, par. 2—8 (" 'Forcible felony' means *** aggravated battery *resulting in great bodily harm or permanent disability or disfigurement* ***" (emphasis added)); *People v. Leahy* (1992), 229 Ill. App. 3d 1070, 595 N.E.2d 198.) Because the jury apparently determined that it was not reasonable for defendant to believe that the force which she used was necessary to prevent imminent death or great bodily harm to herself, it could not have found that defendant reasonably believed that such force was necessary to prevent the forcible felony of aggravated battery from being committed upon her. As such, defendant received the jury's informed consideration of her self-defense theory.

Defendant next contends that she should have been acquitted because the State failed to disprove her claim of self-defense beyond a reasonable doubt.

Self-defense is an affirmative defense (Ill. Rev. Stat. 1989, ch. 38, par. 7—14) which, once raised by a defendant, places the burden on the State to disprove beyond a reasonable doubt that claim. (*People v. De Oca* (1992), 238 Ill. App. 3d 362, 606 N.E.2d 332.) The reasonableness of the defendant's belief of necessity to use deadly force to prevent death or great bodily harm is a question of fact, the determination of which will not be disturbed upon review unless the evidence is so improbable or unsatisfactory as to justify a reasonable doubt as to the defendant's guilt. (*People v. Miller* (1991), 211 Ill. App. 3d 572, 570 N.E.2d 515; *People v. Balfour* (1986), 148 Ill. App. 3d 215, 498 N.E.2d 547.) On appeal, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Sanders* (1991), 212 Ill. App. 3d 773, 571 N.E.2d 836.

■ In the present case, we find the evidence sufficient to support the jury's determination that defendant did not reasonably believe that the use of deadly force was necessary to prevent imminent death or great bodily harm. Josef testified that he saw defendant enter Davis' apartment, pick up a long steak knife, and proceed to make stabbing motions toward the deceased, who was lying on a bed in the apartment. According to Josef, defendant told the deceased at that point that she was "going to kill [his] punk ass. Watch." At that point, the deceased said, "I'm tired of this bitch," got up from the bed and retreated to his apartment. The next thing Josef heard was the deceased yelling, "Oh, she stabbed me." While Josef did not witness the stabbing, he was at the scene immediately thereafter and did not see a gun on or near the deceased. Josef further testified that after

the incident, he saw defendant running away from the building wiping a bloody knife off with her shirt. When defendant saw Josef, she told him not to say anything to anyone.

Smith similarly testified that defendant came to Davis' apartment while the deceased was there lying on the bed. According to Smith, defendant was already holding the steak knife when she arrived. Smith stated that defendant was upset and was yelling at the deceased. Smith went into the hallway with defendant and tried to calm her down. The deceased appeared and he and defendant exchanged words and started heading towards each other. According to Smith, the deceased did not have anything in his hands, and defendant was still holding the steak knife. Smith attempted to stop defendant, but could not. At that point, Davis appeared and Smith steered her into the apartment.

While Smith did not witness the stabbing, Davis testified that she did. Specifically, Davis stated that as Smith was moving her towards her apartment, she turned around and saw defendant "lunge at [the deceased] with a sharp shiny object," striking him in the chest. Seconds later, the deceased stumbled over to the apartment, bleeding from the chest. According to Davis, the deceased had nothing in his hands.

We conclude that the foregoing evidence was sufficient to convict defendant of second degree murder, despite defendant's testimony that the deceased pulled a gun on her and that she thought he was going to kill her. Defendant's testimony, that the deceased approached her, grabbed her by the arm, slapped her and then pulled a gun on her, was contradicted by the testimony of several State witnesses, as recounted above, which indicated that defendant was angry with the deceased, was looking for him, and advanced towards him with the knife. The fact that defendant fled from the scene, instructed Josef not to say anything as she was running away, and disposed of the murder weapon belies her claim that she acted reasonably in self-defense. Moreover, the fact that no gun was found on or near the deceased corroborates the testimony of the State's witnesses that the deceased was unarmed when defendant stabbed him.

We reject defendant's contention that no credence whatsoever should be given to the testimony of Davis—the only witness who stated she saw the stabbing—because she was severely impeached by evidence of prior inconsistent statements she made to police regarding details of the incident. It is the exclusive function of the jury to resolve factual disputes, to reconcile conflicts in the testimony, to assess the credibility of witnesses, and to determine the weight to be given the witnesses' testimony. (*People v. Bradford* (1985), 106 Ill.

2d 492, 478 N.E.2d 1341; *Balfour*, 148 Ill. App. 3d at 223, 498 N.E.2d at 554.) The jury was free to accept whatever details of Davis' testimony it deemed merited belief. Contrary to defendant's assertion, the jury was not obliged to believe her explanation of her conduct. (*People v. Brown* (1992), 232 Ill. App. 3d 885, 598 N.E.2d 948.) As with every other witness, the jury assessed defendant's credibility and determined that her claim of self-defense was not supported by the totality of the evidence. After carefully reviewing the record, we conclude that the evidence was not so improbable or unsatisfactory as to justify a reasonable doubt as to defendant's guilt. Indeed, there was more than ample evidence to support defendant's conviction.

Defendant next contends that the trial court erred in allowing Josef to testify that approximately an hour before the stabbing, he saw defendant in the hallway carrying two knives, and that shortly thereafter two police officers appeared and took the knives away from defendant. Defendant argues that this testimony should have been barred because the knives about which he testified had no connection to the stabbing for which she was convicted, and thus only served to unduly prejudice her.

■ We find, however, that the testimony was admissible to show that defendant had access to knives similar to the knife used to stab the deceased. In *People v. Sutherland* (1992), 155 Ill. 2d 1, 610 N.E.2d 1, our supreme court advanced a similar rationale for affirming the introduction at trial of several knives found on defendant at the time of his arrest, several months after the crime was committed. The defendant there was charged with the rape and stabbing death of a 10-year-old girl. The supreme court stated that "the choice of method of execution tend[ed] to indicate an affinity for such a weapon" (*Sutherland*, 155 Ill. 2d at 20, 610 N.E.2d at 9), and it concurred in the view of the trial court that the knives were probative of the defendant's propensity towards possession and use of knives and were not so prejudicial as to warrant their exclusion. *Sutherland*, 155 Ill. 2d at 20, 610 N.E.2d at 9.

In the present case, although it is undisputed that the knives about which Josef testified were not used in the stabbing incident, the fact that defendant was seen carrying the knives only an hour before the incident indeed tended to indicate her affinity for such a weapon and demonstrated her propensity towards possession and use of knives. In addition, the evidence was relevant to show defendant's state of mind on the night in question, and in particular at the time she stabbed the deceased. Defendant's state of mind was critical in this case since she raised the defense of justifiable use of force. Her defense hinged upon the reasonableness of her belief that she had a

need to use deadly force to protect herself. Josef's testimony, that shortly before the stabbing he observed defendant wandering the hallway carrying two large knives, was relevant to support the State's theory that the stabbing was premeditated.

Defendant also contends that she was deprived of a fair trial due to several improper remarks made by the prosecutor in closing argument. In addressing this issue, we note that the prosecutor is afforded wide latitude in making closing arguments so long as his comments are based on the evidence or reasonable inferences therefrom. (*People v. Carson* (1992), 238 Ill. App. 3d 457, 606 N.E.2d 363.) Reasonable inferences deducible from the evidence may be drawn even if they are unfavorable to defendant. (*People v. Johnson* (1992), 149 Ill. 2d 118, 594 N.E.2d 253.) To merit reversal, a prosecutor's improper comments must be of substantial magnitude such that they constituted a material factor in the defendant's conviction. *People v. Morgan* (1991), 142 Ill. 2d 410, 568 N.E.2d 755, *rev'd on other grounds* (1992), 504 U.S. 719, 119 L. Ed. 2d 492, 112 S. Ct. 2222; *People v. Graca* (1991), 220 Ill. App. 3d 214, 580 N.E.2d 1328.

Defendant first argues that the prosecutor misstated the evidence in closing argument when he described a "fight" that had occurred in the apartment belonging to defendant and Harold, in which the deceased sustained a laceration on his forehead. In recounting the testimony of the State's witnesses, the prosecutor argued that defendant was the one who hit the deceased on the head using a bottle or piece of wood. Defendant maintains that there was no testimony that defendant hit the deceased on the head.

We find, however, that the prosecutor's comments were based on reasonable inferences derived from the evidence. It is undisputed that the deceased sustained a cut to his forehead, as both Smith and Davis testified that he came to their apartment for assistance in treating it. It is also undisputed that there was an altercation at the party in defendant's apartment where both defendant and the deceased were present. The evidence further indicates that shortly after the deceased arrived at Davis' apartment, defendant appeared in an angry mood, and threatened to kill the deceased, all the while making stabbing motions with a knife. At the sight of defendant, the deceased retreated to his apartment. From this evidence, it is a reasonable inference that defendant and the deceased had earlier quarreled and that during this quarrel defendant hit the deceased. We find no error in the prosecutor's comment.

Defendant next cites as error the prosecutor's explanation on rebuttal regarding the reason defendant was earlier carrying two knives. The prosecutor argued that defendant "deliberately [took]

two knives *** to hurt someone." We find that defendant has waived this issue at trial by failing to object to the prosecutor's comments at trial. (*People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.) In any event, even if the error was not waived, the comment was based on a reasonable inference derived from the evidence. Josef unequivocally stated that he saw defendant holding the knives and that the police arrived and took them from her. Later that evening, defendant threatened the deceased with yet another knife and eventually stabbed him with it. The State's evidence indicated that defendant was angry on the evening in question and was specifically angry at the deceased. We cannot say it is an unreasonable inference that defendant was carrying the two knives "to hurt someone." Indeed, she later did just that. We reject defendant's claim of error.

Defendant also argues that the prosecutor misstated the evidence on rebuttal when she stated that the deceased opened his apartment door to see if the defendant had gone. We agree with the State that the comment was invited by the following statements of defense counsel in closing argument:

"[N]ow Maurice [the deceased] emerges into the hallway, out of the doorway of Apartment 1H, Maurice's apartment. *** If Maurice wanted to avoid Sharlene [defendant] and he went out the back door and into his own apartment that way, why didn't he remain in his own apartment? *** There is some reason that Maurice when he chose to go into that hallway chose to go through his apartment first. He wanted to get something from within his apartment."

As the foregoing comments demonstrate, counsel was arguing that the deceased went to his apartment to arm himself for an impending confrontation with defendant, and opened the door for the express purpose of commencing the showdown. The prosecutor merely responded to this argument by arguing that the deceased only opened the door to see if defendant had gone. It is axiomatic that a prosecutor may properly respond to comments made by defense counsel which clearly invite response. (*People v. Brandon* (1990), 197 Ill. App. 3d 866, 557 N.E.2d 1264.) Defendant's claim of error is accordingly without merit.

Defendant also contends that the prosecutor erred in stating that there was no serious provocation committed by the deceased. We reject this contention. Davis testified that as Smith was ushering her into their apartment, she looked behind and saw defendant lunge at the deceased with a sharp shiny object. Moreover, it was defendant who had earlier in the evening threatened to kill the deceased and had simulated stabbing him while he was lying on the bed in Davis'

apartment. In response to defendant's threats, the deceased arose from the bed and went to his own apartment, away from defendant. When the deceased opened his apartment door minutes later, according to the testimony of Smith, the deceased and defendant exchanged words, defendant moved towards the deceased and Smith attempted, unsuccessfully, to stop her. The testimony of the State's witnesses that defendant was angry with the deceased and was carrying around a knife which she refused to give up supports the State's argument that defendant, not the deceased, provoked the incident. Defendant's contention that the comment was error is further weakened by the fact that no gun or other weapon was found on or near the deceased, and by the fact that defendant fled the scene and disposed of the knife. Indeed, these actions on the part of defendant belie the claim that she was the victim and the deceased the aggressor.

Defendant further contends that the prosecutor in closing argument misstated the law regarding the duty to retreat. The prosecutor stated on rebuttal that defendant could have gone down the stairs after the deceased allegedly slapped her, but did not. Defendant argues that, in making this statement, the prosecutor was instructing the jury that she, as the nonaggressor, had a duty to retreat from the deceased from a place in which she had a right to be. Defendant argues that this is not the law in Illinois. (See *People v. Willis* (1991), 210 Ill. App. 3d 379, 569 N.E.2d 113.) While we agree with defendant as to her understanding of Illinois law, we disagree that this in fact was what the prosecutor was arguing. The prosecutor did not *instruct* the jury that defendant had a *duty* to retreat. Rather, the prosecutor merely stated that she *could* have left the scene but did not. Considering the statement in the context of the prosecutor's entire argument, it is apparent to us that the prosecutor was merely attempting to rebut defendant's argument that she was the nonaggressor and the deceased the aggressor, who, according to defendant, slapped her and then threatened her life with a gun. The prosecutor argued that had defendant been as terrified of the deceased as she claimed, it is unlikely that she would have slapped him back after he allegedly slapped her; rather, she would have left the scene. We cannot conclude that the prosecutor was espousing Illinois law on the duty to retreat. Defendant's contention is without merit.

Finally, defendant asserts that the State improperly shifted the burden of proof by commenting in rebuttal closing argument on defendant's failure to call as witnesses the two officers who allegedly confiscated the knives from defendant. When the comments are placed in context, however, it becomes apparent that any error was invited.

During his closing argument, defense counsel stated:

"Now, where are the police officers who went to Apartment 3A in the first place? Where are the ones who supposedly took the knives? They've never been called[.] They never testified to anything they saw. There was no arrest of any person."

It was only after defense counsel raised the issue of the officers' failure to testify that the prosecutor made the following comments during rebuttal closing argument which defendant now cites as error:

"Where are the officers that took her knives away? Where are the officers in the first twenty minutes that were there? Counsel has subpoena power same as all the other people in this court. \*\*\* If they were going to help, don't you think they would have been in here?"

From the foregoing, it is apparent that defense counsel was arguing that the State did not call the officers because the incident of defendant carrying the knives never occurred. Pursuing this line of argument, defense counsel demanded that the State explain the officers' failure to testify. In response to this challenge, the State merely reminded the jurors of the power of compulsory process. Because the comments were invited, they cannot be relied upon as error on appeal. (*People v. Mahaffey* (1989), 128 Ill. 2d 388, 539 N.E.2d 1172.) Moreover, if erroneous, the comments were harmless. We cannot conclude that the outcome of the trial would have been different had the comments not been made.

Finally, defendant contends that the trial court abused its discretion in sentencing her to a prison term of 15 years, the maximum for second degree murder (Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—1). Defendant argues that the sentence does not take into consideration the mitigating factors of her lack of a criminal history, her aversion toward violence, the fact that she is the mother of a minor child, and the stimulus which motivated her conduct. (*People v. Brown* (1991), 218 Ill. App. 3d 890, 578 N.E.2d 1168.) Defendant contends that the trial court departed from the constitutional requirement that the sentence be determined "both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11.

The trial court's sentencing decision is entitled to great deference and weight and will not be altered on review absent an abuse of discretion. (*People v. Streit* (1991), 142 Ill. 2d 13, 566 N.E.2d 1351.) "A trial judge is in a far better position than an appellate court to fashion an appropriate sentence, because such judge can make a reasoned judgment based upon firsthand consideration of such factors as 'the defendant's credibility, demeanor, general moral character,

mentality, social environment, habits, and age' [citations]; whereas the appellate court has to rely entirely on the record [citation]." *Streit*, 142 Ill. 2d at 19, 566 N.E.2d at 1353.

We cannot conclude that the trial court abused its discretion in sentencing defendant to the maximum term of 15 years for the offense of second degree murder. The record reveals that the trial court carefully considered all the evidence, both in mitigation and in aggravation, before imposing the sentence. It is well settled that the court need not recite and assign value to each factor in mitigation upon which it is relying. (*People v. Powell* (1987), 159 Ill. App. 3d 1005, 512 N.E.2d 1364.) Thus, the fact that the court did not expressly delineate the factors which entered into his sentence determination does not persuade us that it abused its discretion in arriving at the 15-year term.

The trial court stated that it had considered the presentence investigation report, emphasizing the fact that defendant had carried a job for only two months during the prior seven-year period. Where the trial court examines the presentence report, it is presumed that the court took into account the defendant's potential for rehabilitation. (*Powell*, 159 Ill. App. 3d at 1011, 512 N.E.2d at 1369.) The court is not, however, required to give greater weight to the defendant's potential for rehabilitation than to the seriousness of the crime. (*Brown*, 218 Ill. App. 3d at 901, 578 N.E.2d at 1175.) The court considered the State-tendered victim impact statements submitted by members of the deceased's family and noted its familiarity with the facts of this case and the nature of the crime of which defendant was convicted. Considering all of the foregoing factors, the court concluded that a 15-year sentence was appropriate.

Similar sentences have been imposed under circumstances much like those in the present case. In *Brown*, for instance, this court determined that a 10-year sentence for second degree murder was not excessive, notwithstanding the defendant's lack of criminal history, the fact that he had a family to care for, and his subjective belief that he was acting in self-defense. *Brown*, 218 Ill. App. 3d at 900-01, 578 N.E.2d at 1175.

Similarly, in *People v. Black* (1992), 223 Ill. App. 3d 630, 585 N.E.2d 1228, this court upheld a 17-year prison sentence for armed violence and a concurrent sentence of 15 years for second degree murder, despite the fact that the defendant was only 22 years old, had a commendable education and employment history, had no problems with drugs or alcohol, showed remorse for his actions, and had the support of his family and community. The court held that although there was evidence of rehabilitative potential, the brutality of

the crime justified the punishment handed down. The court there found it significant that the defendant retreated to a relative's home after the first altercation but then returned to the scene "out of anger," carrying a butcher knife, which he used to kill the deceased.

We have reviewed the record in the present case and can find no evidence that the trial court considered improper factors in arriving at the 15-year sentence.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

EGAN, P.J., and RAKOWSKI, J., concur.