*In re* E.H., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. E.H., Respondent-Appellant).

First District (2nd Division)    No. 1—96—3450

Opinion filed September 1, 1998.

Rita A. Fry, Public Defender, of Chicago (Pamela Pfrang, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Margaret J. Faustmann, and Holly E. Desnet, Assistant State's Attorneys, of counsel), for the People.

JUSTICE RAKOWSKI delivered the opinion of the court:

On September 17, 1995, respondent's gang confronted another gang at a baseball field near 17th Avenue and Bloomingdale in Melrose Park. Testimony at trial showed that soon after respondent's group began throwing bottles at the other gang, respondent wielded a chrome automatic handgun and began shooting toward the other gang. Steven Finney suffered a gunshot wound to the head, which eventually caused his death.

Following a bench trial, respondent, E.H., a 15-year-old minor, was adjudicated delinquent for committing first-degree murder. From this finding, respondent appeals. We find that: (1) respondent was proved guilty beyond a reasonable doubt based on clear, uncontradicted, and substantiated accomplice testimony; (2) the testimony of an officer which included nonverbal, nonassertive conduct of respondent's mother was not hearsay; and (3) the State's use of any hearsay inference during closing argument was not considered in the trial court's adjudication and, thus, did not prejudice the respondent.

## I. FACTS

Jaime Aguilera testified on behalf of the State. Aguilera at first answered "no" to some of the State's initial questions as to whether he saw anything unusual on September 17, 1995, a shooting, or a crime take place. Nonetheless, Aguilera testified that he, respondent, and about 10 other individuals met in Franklin Park and then headed by car to respondent's house located at 2017 North 17th Avenue in Melrose Park. Aguilera testified that after they arrived at respondent's house and exited their cars, some of the individuals said that they were supposed to find some other rival gang. Because the gangs were in some type of fight, they gathered rocks and bottles, and he, respondent, respondent's brother, and the other individuals headed toward a park that was also on 17th Avenue. Upon arriving, the group found members of another gang. Aguilera stated that the other gang began to charge toward them and, in response, his group charged while throwing bottles at them. Aguilera testified that it was at this time he saw respondent pull out a chrome automatic handgun and begin shooting toward the other gang. Aguilera estimated that respondent fired six to seven shots. Aguilera testified that it appeared that respondent

was the only individual from either group who had a gun. Aguilera stated that, after the shooting, respondent ran back to his house.

On cross-examination, Aguilera admitted that when he spoke to the police on the day following the shooting, he told them two different stories. Aguilera admitted that he first told the police that he stayed in respondent's house when respondent and respondent's brother left to fight someone and that when they returned they seemed to be in a normal mood. Aguilera admitted that later the same day he told police that he stood by the park as a large group of respondent's friends went to the corner of 17th Avenue and Bloomingdale and that he heard gunshots. He also conceded at trial that he originally claimed that it was respondent's brother who shot the gun. Aguilera acknowledged on cross-examination that the police arrested him in connection with the shooting, that he was brought before a grand jury, that he spent three days in jail, and that he was still in "trouble" for the crime.

Victor Fong and Fernando Hernandez, who were near the location of the shooting, also testified for the State. Fong testified that he saw Steven Finney alive earlier on September 17, 1995. Fong testified that around 6:30 or 7 p.m., before the shooting, he saw respondent, respondent's brother, and Jose Rocha flashing gang signs while driving around in a blue car on Bloomingdale. He also testified that a blue car towed by the police and shown in a State's exhibit matched the one that respondent, respondent's brother, and Rocha were riding in on the day of the shooting. Finally, Fong stated that, while standing about 50 yards away from the baseball field, he heard some screaming followed by gunshots.

Similar to Fong, Hernandez was close to where the shooting occurred. An hour prior to the shooting, Hernandez saw respondent, respondent's brother, and Rocha flashing gang signs while driving in a blue LeSabre near the location of the shooting. He stated that later, while heading toward the baseball field, he saw approximately 15 youths approaching and soon after that he heard shots being fired. Hernandez also identified a car towed by the police and shown in a State's exhibit as being the same blue LeSabre that he saw respondent, respondent's brother, and Rocha riding in before the shooting.

Jose Heredia and Primitivo Fanco also testified for the State. Heredia testified that he, the victim, and other individuals were near 17th Avenue and Bloomingdale when another group came towards them saying "I.D. love" and throwing bottles at them. Heredia testified that it was at this time the victim was shot in the head. Fanco testified that he saw the victim immediately after he was shot at the Little League field in Melrose Park.

The State also called two police officers to testify. Officer Vito Scavo testified that upon the request of Mrs. H., respondent's mother, he met with her at the police station. After they met, they went to 17th Avenue and Fullerton. He testified that, upon arriving, she pointed to a weeded lot. He testified that he searched the area, and after a few minutes, he found a .380-caliber chrome pistol.

Officer Michael Castellan testified that he was called to the Little League field on the 1900 block of 17th Avenue in Melrose Park at approximately 8 p.m. on September 17, 1995. There he discovered approximately five .380-caliber automatic casings in the middle of the street. He also testified that the police towed a blue 1986 Buick LeSabre owned by Jose Rocha.

Finally, the State called respondent's mother to testify. However, she invoked her fifth amendment right not to incriminate herself and did not contribute to the evidence. After the State rested, respondent motioned for a directed verdict, and the court denied the motion. Respondent did not testify and did not call any witnesses.

Upon finding respondent delinquent, the trial court committed respondent to the Illinois Department of Corrections until his twenty-first birthday. Respondent appeals. We have jurisdiction pursuant to Supreme Court Rules 602, 603, and 660(a) (134 Ill. 2d Rs. 602, 603, 660(a)).

## II. DISCUSSION

### A. Whether the Evidence Presented Proved Guilt Beyond a Reasonable Doubt

Respondent's first contention on appeal is that the trial court should not have found him delinquent beyond a reasonable doubt based on the testimony of Aguilera, the alleged accomplice.

■ A reviewing court's function is to determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *People v. Steidl*, 142 Ill. 2d 204, 226 (1991). "A reviewing court may not substitute its judgment as to the weight of the evidence or the credibility of witnesses, but will reverse only if the evidence is so improbable, impossible, or unsatisfactory as to raise a reasonable doubt as to defendant's guilt." *People v. Jackson*, 145 Ill. App. 3d 626, 640 (1986). " 'Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution.' " *People v. Young*, 128 Ill. 2d 1, 49 (1989), quoting *Jackson v. Virginia*, 443 U.S. 307, 318-19, 61 L. Ed. 2d 560, 573-74, 99 S. Ct. 2781, 2786-89 (1979).

■ "The uncorroborated testimony of an alleged accomplice is sufficient to warrant a conviction, and the fact that the accomplice is a self-confessed criminal and expects leniency does not, of itself, raise a reasonable doubt." *Jackson*, 145 Ill. App. 3d at 639. However, accomplice testimony is inherently weak because the accomplice is often motivated to testify contrary to the defendant's interests based upon malice, fear, threats, promises or hopes of leniency, or benefits from the prosecution (*Young*, 128 Ill. 2d at 47-48) and, thus, it should be "accepted only with utmost caution and suspicion and have the absolute conviction of its truth." *People v. Williams*, 147 Ill. 2d 173, 233 (1991). Nevertheless, corroborated or uncorroborated accomplice testimony is sufficient to convict a defendant of the charged crime where it convinces the trier of fact of the defendant's guilt beyond a reasonable doubt. *Williams*, 147 Ill. 2d at 233.

Respondent contends that Aguilera's testimony was incredible and, thus, insufficient to support a finding of guilt because Aguilera's initial comments to the police were inconsistent with his trial testimony and because the State might have given him assurances. Respondent also argues that, without corroboration as to who fired the gun, Aguilera's testimony, alone, is insufficient to convict.

Contrary to this argument, Illinois courts have consistently affirmed convictions based on uncorroborated accomplice testimony where the accomplice is found positive and credible, even though the accomplice was not initially forthright with the police and the State promised leniency in exchange for the accomplice's testimony. In *Jackson*, the appellate court affirmed defendant's murder conviction that was based solely on uncorroborated testimony from an accomplice who was an acknowledged criminal. *Jackson*, 145 Ill. App. 3d at 640. In *Jackson*, not only did the accomplice initially deny to police that she knew about defendant's alleged crime, but she also later agreed to testify against defendant in exchange for dismissal of the murder charge against her. *Jackson*, 145 Ill. App. 3d at 629, 640.

Similarly, in *People v. Padilla*, 91 Ill. App. 3d 799, 801-02 (1980), the appellate court affirmed defendant's bench trial manslaughter conviction that was based on the uncorroborated testimony of an accomplice who testified in exchange for dismissal of the charges against him. In *Padilla*, even though other testimony explained the events leading up to and after the shooting, the accomplice's testimony was the only evidence that identified defendant as the person who fired the gun that killed the victim. *Padilla*, 91 Ill. App. 3d at 800-01; see also *People v. Lopez*, 242 Ill. App. 3d 160, 167 (1993) (only evidence indicating that defendant sold the drugs was from the accomplice's testimony); see generally *People v. Nicholls*, 236 Ill. App. 3d 275 (1992); *People v. Davis*, 132 Ill. App. 3d 199 (1985).

Despite the above precedent, respondent argues that this court should reverse the trial court's adjudication. Respondent relies on two cases, *In re D.R.S.*, 267 Ill. App. 3d 621 (1994), and *People v. Wilson*, 66 Ill. 2d 346 (1977), where the courts reversed convictions that were based on uncorroborated accomplice testimony. However, we find these cases distinguishable and unpersuasive.

In *In re D.R.S.*, the court reversed respondent's conviction not only because it was premised on uncorroborated accomplice testimony, but also because it found other circumstances that undermined the trial court's adjudication. The court asserted that: respondent's alibi was never challenged by the prosecution; the evidence failed to show that the accomplice and respondent were friends or socialized together; the accomplice initially lied to the authorities by denying any responsibility; the accomplice admitted instigating the crime; the accomplice had other charges pending; the accomplice testified under a grant of immunity; and the accomplice's time line of the events would have placed the victim at home at the time of the burglary, contrary to the victim's account.

More importantly, the appellate court insinuated that the trial judge was biased contrary to respondent's interests. The court noted that, during the dispositional hearing, the trial judge asserted that "he had spent more time on [respondent's] case and had given [respondent] more opportunities than any juvenile that had come before him." *In re D.R.S.*, 267 Ill. App. 3d at 625. The trial judge blasted the respondent during the hearing by stating that he believed respondent was "one of the most dangerous kids" he had seen for a long time and that he sincerely hoped respondent would be incarcerated " 'for a very long period of time for the protection of the persons and property of the people of this community.' " *In re D.R.S.*, 267 Ill. App. 3d at 625.

The court also considered it inconsistent that the trial court found sufficient evidence to convict respondent for the burglary, but not for the theft of a firearm. The court reasoned that if the accomplice's testimony was the basis for convicting respondent for the burglary, then it followed that the trial court should have convicted respondent for the theft of a firearm. The appellate court opined that these inconsistencies between the trial court's findings undermined the sufficiency of the evidence supporting the burglary charge. Thus, in light of the accomplice's incredibility and the circumstances surrounding respondent's conviction, the appellate court found that reasonable doubt remained as to whether the respondent was guilty.

In *Wilson*, our supreme court also reversed a defendant's conviction that was based on uncorroborated accomplice testimony. *Wilson*, 66 Ill. 2d at 350. Although the court reasoned that the State's promise

of immunity to the accomplice undermined the credibility of the accomplice, it also included in its consideration other circumstances that provided reasonable doubt as to defendant's guilt. The court noted that it was the accomplice who instigated the crime. The court also considered the fact that "not only did the complainant fail to identify the accused at a lineup, but she identified another man—the same man—three times." *Wilson*, 66 Ill. 2d at 350. Moreover, she was unable to pick defendant from the lineup even though the persons in the lineup were required to repeat the same words that the robber said during the crime. The court further considered that the victim's description of the criminal as being 5 feet 6 inches tall conflicted with defendant's actual height of 6 feet 1 inch.

◼ Although the instant case lacks direct evidence supporting the accomplice's assertion as to who performed the criminal act, as was found in *In re D.R.S.* and *Wilson*, those courts did not view that fact alone as dispositive of whether there remained a reasonable doubt. Rather, they focused on the contradictory evidence affecting the credibility of the accomplices as well as other circumstances that precluded a finding of guilt beyond a reasonable doubt. *In re D.R.S.*, 267 Ill. App. 3d at 625, 628-29; *Wilson*, 66 Ill. 2d at 350. See also *People v. Newell*, 103 Ill. 2d 465, 471 (1984) (affirming appellate court's reversal of defendant's conviction "where the only evidence [was] the testimony of three accomplices, all convicted felons, one of whom [said] defendant [was] guilty and two of whom [said] he [was] not, with no corroboration of either view" (emphasis omitted)). Unlike the above cases, the circumstantial evidence in this case supports Aguilera's credibility and corroborates his account of the events that occurred before and after the shooting. Moreover, unlike *In re D.R.S.* in particular, the trial court in this case lacked even a scintilla of bias against respondent that would undermine the sufficiency of Aguilera's testimony.

At trial, Fong and Hernandez confirmed that the blue LeSabre that the police towed after the shooting and that belonged to Rocha was the same car respondent was in when they saw him flashing gang signs near the location of the shooting. This testimony coincides with Aguilera's assertion that respondent, he, and other individuals drove from Franklin Park to 17th Avenue near Bloomingdale in Melrose Park, and it also shows that rival gang activity was a catalyst for the shooting. Similarly, one reasonably can infer from this evidence that respondent had a motive for bringing the gun to confront the other gang in the park.

Likewise, the testimony of Heredia and Fanco confirms Aguilera's testimony that two groups confronted each other near the baseball field in Melrose Park. Corroborating Aguilera's account, Heredia as-

serted that when Aguilera and respondent's group met his group, respondent's group began throwing bottles at them. Heredia also corroborated Aguilera's testimony that it was at this time someone from Aguilera and respondent's group shot the victim.

Lastly, Officer Castellans testified that he found five .380-caliber automatic casings at the scene of the murder. This testimony supports Aguilera's approximation that respondent fired about six or seven shots from an automatic gun. Thus, unlike the circumstances found in the cases respondent cites, the nonaccomplice testimony and the other evidence presented in this case substantiated Aguilera's testimony.

In light of the facts in this case and the precedent before us, we find that a rational trier of fact could find respondent guilty of first degree murder. Therefore, we reject respondent's argument that the evidence was insufficient to sustain his adjudication of delinquency.

## B. Whether the Trial Court Admitted Hearsay Evidence

Respondent contends that the trial court erred by admitting nonverbal hearsay. The following testimony from Officer Scavo is at contention:

"MR. COMROE [Assistant State's Attorney]: Did you have occasion to speak with Mrs. H[.]?

A. Yes.

Q. Did you have occasion to go anyplace with her?

A. Yes.

Q. Where did you go?

A. 17th Avenue and Fullerton in my automobile.

Q. Did Mrs. H[.] accompany you?

MR. HUTT [Defense attorney]: Objection. Hearsay. This is obviously trying to testify *** as to the declarant's speech by cloaking it in non-verbal actions.

THE COURT: Hearsay is not admissible but the officer is testifying [as] to what occurred. The hearsay objection would be overruled.

MR. COMROE [Assistant State's Attorney]: Where did you go with Mrs. H[.]?

A. 17th Avenue and Fullerton.

Q. How far is that from the park you just described?

A. Approximately half a mile.

Q. What occurred when you and Mrs. H[.] got to the location?

A. She informed that—

MR. HUTT [Defense attorney]: Objection.

MR. COMROE [Assistant State's Attorney]: Just tell me what she did?

A. We exited the car. She pointed out an area.

Q. What did you then do?
A. I searched the area.
Q. Did you find anything?
A. Yes.
Q. What was that?
A. A pistol.
Q. Where was the pistol found by you?
A. A weeded lot."

■ To qualify as hearsay, the statement, oral or written, must be offered to establish the truth of the matter asserted. *People v. Simms*, 143 Ill. 2d 154, 173 (1991); R. Ruebner, Illinois Criminal Trial Evidence 183 (3d ed. 1997), citing, *inter alia, People v. Rogers*, 81 Ill. 2d 571 (1980); *People v. Murray*, 201 Ill. App. 3d 573 (1990). Such statement is "hearsay because its value as evidence depends on the credibility of an out-of-court asserter from whom there is no opportunity for cross-examination." R. Ruebner, Illinois Criminal Trial Evidence 183 (3d ed. 1997). However, "[t]estimony about an out-of-court statement which is used for a purpose other than to prove the truth of the matter asserted in the statement is not 'hearsay.' " *Simms*, 143 Ill. 2d at 173. A police officer's testimony regarding another's statements or nonverbal conduct is not hearsay if it is offered to explain the steps in his investigation of the crime. *Simms*, 143 Ill. 2d at 174. Moreover, "[t]estimony describing the progress of the investigation is admissible even if it suggests that a nontestifying witness implicated the defendant." *Simms*, 143 Ill. 2d at 174.

■ Accordingly, Officer Scavo's testimony did not contain any hearsay. The assertion that respondent's mother pointed toward a weedy lot where Officer Scavo found a pistol was not offered for the truth of the matter asserted. Rather, it was offered to describe Officer Scavo's investigation. Thus, we find that Officer Scavo's testimony did not contain hearsay.

## C. Whether the State's Use of a Hearsay Inference During Its Closing Argument is Reversible Error

■ Respondent also contends that the State used Officer Scavo's testimony, which was admitted for a limited purpose, as substantive evidence during closing argument. Respondent argues that the State's closing argument drew an improper hearsay inference from Scavo's testimony to connect the gun to the respondent. The State argued:

"The chief of police, your Honor, had no knowledge of that case other than what was being directed to the Melrose Park Police Department and went in a vehicle with [Mrs. H.], your Honor, went into some field to pick up a .380 caliber Bryco which is, your Honor, identical to the type—or is of a caliber, your Honor, which is

capable of firing the types of cartridges that were expelled from some sort of automatic at the scene of the fatal shooting."

Respondent correctly asserts that this argument prompts the fact finder to draw an improper hearsay inference from Scavo's testimony. Nevertheless, a reviewing court presumes that, during a bench trial, the trial court considered only properly admitted and competent evidence when it made its determinations and that respondent was not prejudiced. *People v. Simac*, 161 Ill. 2d 297, 311 (1994); *People v. Eddmonds*, 101 Ill. 2d 44, 66 (1984).

Based upon a review of both the trial court's findings at the dispositional hearing and its reiteration of those findings upon respondent's motion for reconsideration, we find that the trial court did not rely on any hearsay inferences to find respondent guilty beyond a reasonable doubt. Rather, the trial court made it abundantly clear that it relied on Aguilera's testimony in making its determination. Thus, we conclude that the above assertions in the prosecutor's closing argument did not prejudice the respondent. See *People v. Wilburn*, 263 Ill. App. 3d 170, 181 (1994) ("To merit reversal, a prosecutor's improper comments must be of substantial magnitude such that they constituted a material factor in the defendant's conviction").

### III. CONCLUSION

Therefore, for the foregoing reasons, we affirm the circuit court's adjudication of respondent as a delinquent.

Affirmed.

COUSINS, J., concurs.

PRESIDING JUSTICE McNULTY, respectfully dissenting:

The majority acknowledges that Aguilera, the only witness who identified defendant as the shooter, acted as an accomplice. When a criminal conviction rests upon the testimony of an accomplice, that testimony should have the " 'absolute conviction of the truth.' " *Wilson*, 66 Ill. 2d at 349, quoting *People v. Zaeske*, 67 Ill. App. 2d 115, 121 (1966). The conviction of the truth is conspicuously absent from Aguilera's testimony.

Aguilera first told the court that when he saw defendant on the evening of September 17, 1995, they did not do anything or go anywhere, and he saw no crime take place. Then he admitted that he, defendant, and three others he named drove around Melrose Park together.

The testimony then becomes nearly incoherent, as Aguilera said:
"So we got off the car and I seen [defendant], his brother and Jose. I was with them, go inside the house.

Q. Then what happened?

A. We were in a fight so we had gathered some rocks and bottles and later on they had came out so we had went to the park."

The prosecutor chose not to attempt to clarify this testimony, although this testimony provided the setting for the assertion that Aguilera saw defendant shoot at the other gang in the park.

Aguilera's testimony lacks corroboration in any significant detail. Compare *People v. Waln*, 169 Ill. App. 3d 264, 272, 523 N.E.2d 1318 (1988); *Wilson*, 66 Ill. 2d at 350. Aguilera never mentioned a blue LeSabre, nor did the prosecutor ask the make of the car Aguilera and defendant rode around in that night. According to Aguilera's testimony, the three others in the car did not include defendant's brother or Jose Rocha. Fong and Hernandez both swore they saw defendant with his brother and Rocha that evening, around the time Aguilera said he was riding with defendant. "[C]ontradiction of an accomplice's testimony, as well as material corroboration, is entitled to considerable weight." *People v. Eddington*, 129 Ill. App. 3d 745, 779, 473 N.E.2d 103 (1984).

Most significantly, the testimony of Fong and Hernandez corroborates one of Aguilera's prior statements to police. Aguilera said he, too, was with Rocha when Rocha drove around Melrose Park, and then they all went to defendant's home. But in that statement, Aguilera told police that defendant's brother, not defendant, shot the gun. The record before the court gives no indication of why the police rejected that version and continued questioning Aguilera until he implicated defendant. The evidence in the record corroborates the statement Aguilera made to police, implicating defendant's brother, better than it corroborates his courtroom testimony.

The prosecution elected not to try to show defendant guilty as his brother's accomplice. Without some evidence to help the trier of fact determine that the earlier statement implicating defendant's brother is false, the evidence cannot support the conviction of defendant beyond a reasonable doubt. Accordingly, I dissent.