2022 IL App (1st) 200634-U

No. 1-20-0634

Order filed February 17, 2022

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE TRIAL COURT OF ILLINOIS

FIRST DISTRICT

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|---|---|---|
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 4185 |
| | ) | |
| MARTIN MIRANDA, | ) | Honorable |
| | ) | James Michael Obbish, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE LAMPKIN delivered the judgment of the court.
Justices Rochford and Martin concurred in the judgment.

**ORDER**

¶ 1     *Held*:  Defendant's convictions and sentence are affirmed where: (1) defendant was not denied the effective assistance of counsel at trial and his forfeited claims of error are not excused by the plain error doctrine; and (2) defendant was not denied the effective assistance of counsel at sentencing.

¶ 2     Defendant Martin Miranda and codefendant Andres Guerra were charged with multiple counts of first-degree murder based on the shooting death of 15-year-old Miguel Navarrete on January 26, 2014. The cases were later severed. A jury convicted defendant of first-degree murder

and found that he personally discharged the weapon that killed the victim. The trial court sentenced defendant to a total of 75 years' imprisonment in the Illinois Department of Corrections.

¶ 3     On appeal, defendant alleges that he was denied the effective assistance of counsel at trial and sentencing. Alternatively, he alleges that forfeited errors that occurred at trial are subject to review under the plain error doctrine.

¶ 4     For the reasons that follow, we reject defendant's claims and affirm his conviction and sentence.[1]

¶ 5                           I. BACKGROUND

¶ 6                        A. Pretrial Proceedings

¶ 7     The State filed a pretrial motion to admit gang evidence. Specifically, the State alleged that Miguel Angel Navarette, a member of the Two-Six street gang, was killed in retaliation for the earlier murder of defendant's friend, Johnny Vargas, a member of the rival Latin Kings street gang. The State moved to admit gang evidence based on its belief that such evidence was relevant to show defendant's motive for shooting the victim.

¶ 8     Defense counsel opposed the State's motion. At a hearing before the trial court, the parties argued their respective positions. After considering the parties' countervailing interests, the trial court made a lengthy and detailed oral finding granting the State's motion. The trial court found that defendant's gang membership was extremely probative to show his motive for committing what would otherwise be an inexplicable act.

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

¶ 9     Defense counsel successfully opposed the State's motion to admit the testimony of jail house informant Nicolas Diaz.

¶ 10    The trial court denied codefendant's motion to quash the search warrant that resulted in the recovery of his phone and the extraction of its contents. The State then moved to admit three video clips extracted from codefendant's phone. The video clips were all dated December 5, 2013, and recorded at 3:44 a.m., 4 a.m., and 4:02 a.m., respectively.

¶ 11    The State characterized the contents of what it believed each clip showed and then played the clip to the trial court. The State described the first clip as showing the area of 25th Street and Trumbull Avenue, which it alleged was the territory of the Latin Kings street gang. The State alleged that the first clip showed defendant displaying an upside-down bunny tattoo on his arm, identifying codefendant by his nickname, "Baby K," and making references to "Karlov, killer bitch." The State noted that the victim was murdered in the area of Kedvale Avenue and Karlov Avenue a little more than a month after the making of this recording.

¶ 12    The State then discussed the contents of the second clip. The State alleged that the second clip showed the area of 30th Street and Kedvale Avenue, the precise area where the victim was killed the following month. The State alleged that the video clip contained numerous gang-related remarks.

¶ 13    The State described the third clip as showing codefendant standing on the steps outside a house on Karlov Avenue. The State maintained that the contents of the third clip suggested that defendant was recording codefendant and that codefendant then resumed recording defendant. The State also described the third clip as showing codefendant's black truck parked in front of the house with its lights on. The State alleged that the audio from the third clip contained multiple gang-related statements, including "we're out here, come and get us, come get your body bag" and

made repeated references to "Karlov killer." The State alleged that the third clip showed codefendant displaying a gang sign and defendant displaying the symbol for an upside-down bunny, the symbol of the Two-Six street gang. The State described defendant saying, "[b]ody, count me up. Body count me up" at the end of the third clip.

¶ 14    In finding the three clips admissible as co-conspirator evidence, the trial court ruled that *Bruton v. United States*, 391 U.S. 123 (1968), did not bar the video clips from being admitted at either defendant or codefendant's trial:

"THE COURT: This is not a *Bruton*[-]type situation. They are recovered from a phone taken from Guerra. The films depict primarily Defendant Miranda as the principal performer in the videos who is making, you know, the majority of all statements, but they go to both defendants.

It is Defendant Guerra's phone that he kept. He clearly is the individual that is choosing to videotape what primarily Miranda is stating. Although I think especially in this last video, I think it's pretty clear Miranda was holding the phone with his own hand for a good portion of it while he is going through his rant, you know, describing, you know, apparently what demonstrates is a motive to, you know, kill a Two[-]Sixer.

The defendants both prepared these videos jointly. The fact they're all on the one phone that was recovered when Guerra is arrested doesn't mean it is not evidence against Miranda because Miranda is the principal actor in these things. They refer to each other. You know, they flash their signs together. They thought these movies were a great idea, and now they're stuck with them.

I think they're – it's competent. It's material. And it's relevant to the charges. And it's relevant to motive. It's relevant to where the homicide took place. It's relevant to who had possession of a truck that's allegedly used in the commission of the homicide.

These will be all admitted at both defendant's trials over objection of both defendants."

¶ 15    The State then sought a pretrial ruling regarding the admissibility of still images taken from codefendant's phone. The State moved to admit two images dated November 30, 2013, that displayed defendant and a second person flashing a gang sign and defendant and codefendant flashing gang signs. The State offered to redact from both photos a handgun held by defendant in the first photograph and by codefendant in the second photograph. Defendant's counsel agreed to the admission of the photographs subject to the redactions. The State also sought to admit a photograph taken on December 11, 2013, at 12:46 a.m., that depicted the area of Karlov Avenue and West 30th Street. The trial court granted the State's motion to admit these three photographs.

¶ 16    Defendant's counsel and codefendant objected to the admission of a series of photographs that depicted three individuals, one of whom was codefendant. The individuals displayed gang signs, and one individual (not codefendant) held a shotgun. The State maintained that the photographs, taken six days before the murder, were relevant and that the shotgun depicted in them appeared to be the shotgun used to murder the victim. The trial court found two of the three photographs admissible. It disallowed the first photograph, which only partially revealed codefendant's face. The trial court also disallowed a photograph that depicted codefendant at Trumbull Avenue and 25th Street to be admitted against defendant.

¶ 17    Over defense counsel's objection, the trial court also granted the State's motion to admit as co-conspirator evidence, statements made by individuals from the "lead" SUV, and by codefendant at the scene of the crime in which they yelled "Two-Six" and flashed the "Two-Six" gang sign.

¶ 18    The State also sought a pretrial ruling on the admissibility of defendant's electronically recorded interview to the police while in custody. Defense counsel stated that he had no objection to the admissibility of such evidence but believed that the first 48 hours of the interview, in which defendant denied committing this offense more than 19 times, should also be admitted at trial. The trial court disagreed, finding such evidence, if offered by defendant, to be inadmissible hearsay and finding the doctrine of completeness inapplicable.

¶ 19                                  B. Trial Testimony

¶ 20    Erica Navarette Valdez testified she last spoke with her son Miguel on January 25, 2014. Miguel, who was 15 years old, arranged to visit her and his siblings at her home the following day. Ms. Valdez resided in the area near 30th Street and South Kedvale Avenue.

¶ 21    Ms. Valdez testified that Miguel said he wanted to see his family and missed them a lot. He wanted to see his brothers and give her a letter to deliver to one of his older brothers. He asked for the numbers of his aunts and uncles, whom he wanted to call to "know that they were okay."

¶ 22    Miguel never made it to his mother's house. On January 26, 2014, a boy who resided on the second floor of Ms. Valdez's apartment building told Ms. Valdez that Miguel had been shot. When Ms. Valdez ran outside to see Miguel, the police informed her that she could not see him because he was dead.

¶ 23    On cross-examination, defense counsel asked Ms. Valdez why Miguel did not live with her. Ms. Valdez testified that Miguel was afraid to reside with her because the gang that controlled

her street wanted him to join and beat him up whenever they saw him. Miguel was living with a woman who was a family friend, and he helped care for her children. Miguel would visit her and his brothers about once a week.

¶ 24    Amanda Pavon testified that she met Miguel while living near 30th Street and South Kedvale Avenue. Ms. Pavon, who grew up in that neighborhood, testified that the Two-Six street gang occupied it. The specific faction of the Two-Six street gang that occupied this area was called "K-Town." Ms. Pavon testified that the Two-Six gang sign was a bunny and demonstrated the symbol with her right hand.

¶ 25    Ms. Pavon, her husband, Jorge, and their three children moved out of the neighborhood in 2013. Miguel took up residence with her family and helped care for her children. On January 26, 2014, Ms. Pavon drove Miguel to Chicago to visit his family. It was snowing outside. Mr. Pavon was seated in the front passenger seat of their car, seven-year-old Aliyah was seated behind Ms. Pavon, three-year-old Julian was in a car seat in the middle of the rear seat, and Miguel was sitting behind Mr. Pavon.

¶ 26    At 4:45 p.m., Ms. Pavon stopped her car at the corner of 30th Street and South Kedvale Avenue so that Miguel could go into a store at the location and purchase some chips for Julian. Miguel exited the car and reached into the trunk to get change from Ms. Pavon's purse. Julian started to get out of the car seat because he wanted to go inside with Miguel.

¶ 27    Ms. Pavon saw a blue Suburban SUV turn onto 30th Street from South Kedvale Avenue. The occupants of the Suburban displayed the bunny gang sign, but the sign was not as "curled" as it should be. The irregularity of the sign led Ms. Pavon to know that the occupants of the Suburban were not from the neighborhood and were not Two-Sixers.

¶ 28    Ms. Pavon saw a black SUV, either a Yukon or an Envoy pull up right behind the Suburban. Ms. Pavon saw the individuals in the black SUV throwing up gang signs and "yelling stuff." Ms. Pavon observed the driver of the black SUV also display an incorrect bunny sign and yell out, "Two-Six." Ms. Pavon knew that the driver of the black SUV was also not a Two-Six gang member.

¶ 29    The back door of the black SUV opened, and an individual, later identified by Ms. Pavon as defendant, jumped out, said "Two-Six," and grabbed a shotgun that he was sitting on. Miguel was not paying any attention to defendant because he was preventing Julian from falling out of the car. Defendant pointed the shotgun at Miguel and fired the first shot. Ms. Pavon testified that defendant was about four or five feet from Miguel when he fired the first shot. Miguel's body first struck the back of the car door, and he then fell to the ground.

¶ 30    Defendant then pointed the gun at Ms. Pavon and Julian, who had moved towards his mom. Miguel screamed to draw defendant's attention away from them and told defendant, "f*** you." Defendant then moved the gun away from Ms. Pavon and Julian's faces and shot Miguel two more times.

¶ 31    Ms. Pavon saw defendant get back inside the black SUV, after which the car followed the Suburban eastbound on 30th Street. Ms. Pavon then went to check on Miguel, whom Julian was holding. Miguel was trying to breathe, and Ms. Pavon attempted to keep him awake. Neighbors attempted to give Miguel CPR. Police officers and an ambulance arrived. Miguel was pronounced dead at the scene.

¶ 32    Ms. Pavon testified that no one in her car had a gun or any weapons on them that day. Ms. Pavon also testified that on January 26, 2014, defendant did not have any tattoos on his face.

¶ 33    Ms. Pavon described defendant to the police as a male Hispanic, 15 to 20 years old, with a thin light mustache and goatee, short hair, and a dark hoodie. On February 1, 2014, Ms. Pavon identified defendant as the driver from a photo array.

¶ 34    On February 4, 2014, Ms. Pavon viewed a lineup and realized that she had erroneously identified defendant as the driver when he was actually the shooter. She immediately informed the detectives of her mistake. The same day, Ms. Pavon viewed a second lineup and identified codefendant as the driver of the black SUV. Ms. Pavon testified that codefendant was the individual who was throwing up the bunny gang sign as he drove past her car. Ms. Pavon testified that she gave a videotaped statement to an assistant state's attorney and later testified before a grand jury and identified defendant as the shooter and explained her earlier mistaken identification of defendant as the driver.

¶ 35    On cross-examination, Ms. Pavon testified that her husband was a former member of the Two-Six street gang. He was no longer a gang member on January 26, 2014. Miguel was also a former member of the Two-Six street gang.

¶ 36    Jorge Pavon provided similar testimony to that given by Ms. Pavon regarding January 26, 2014. Mr. Pavon admitted being a former member of the Two-Six street gang and receiving a two-year sentence in the Illinois Department of Corrections for a felony gun charge. Mr. Pavon testified that the area around 30th Street and South Kedvale Avenue was Two-Six street gang territory. The area around 25th Street and South Trumbull Avenue was the territory of the Latin Kings street gang. Mr. Pavon testified that when the bunny hand gesture is "thrown down," it means that the person making the gesture is saying "Two-Six killer." "Two-Six killer" indicates that a rival gang is seeking to kill a member of the Two-Six street gang.

¶ 37    On January 26, 2014, Mr. Pavon was no longer a member of the Two-Six street gang. At that time, Mr. Pavon was on parole for his gun conviction. Mr. Pavon testified that how the individual in the blue Chevy Suburban "threw up" the gang sign "just wasn't the way we threw it up." Mr. Pavon testified that such misuse of a gang sign is called "false flagging." The purpose of false flagging is to catch gang members associated with a particular geographical area off-guard. Mr. Pavon testified that it is common for gang members to enter rival territory and that when they do so, "[t]hey're up to no good."

¶ 38    When Mr. Pavon saw the person in the blue Suburban false flagging, he thought something would happen. Mr. Pavon told Miguel to be careful because he did not recognize these people. Mr. Pavon described the driver of the Suburban as a male Hispanic with a stocky build. Mr. Pavon heard an exchange of words between Miguel and someone inside the black SUV. Mr. Pavon testified that the individual who shot Miguel fired three times and then pointed the shotgun at him, his wife, and their children.

¶ 39    Mr. Pavon dialed 911. The three-minute and 37-second 911 call was played for the jury. In it, Mr. Pavon can be heard asking for an ambulance to come to the corner of 30th Street and South Kedvale Avenue to assist the 15-year-old victim, who had been shot. Mr. Pavon described two SUVs and possibly a third vehicle involved in this incident. He described the SUVs as a big Suburban and a smaller black SUV, possibly a Bravado. Mr. Pavon said that the guy in the back of the second SUV had the shotgun. He described the group as male Hispanics and said they drove eastbound on 30th Street towards Pulaski Avenue after the victim was shot.

¶ 40    In the background of the 911 call, a woman (Ms. Pavon) can be heard crying, and Mr. Pavon is heard telling her, "[h]e's gone baby, he's gone baby, he's gone." Both Mr. and Ms. Pavon implore the victim to "wake up, wake up."

¶ 41     Mr. Pavon testified that he spoke with police officers, detectives, and an assistant state's attorney, to whom he provided a videotaped statement. On February 4, 2014, Mr. Pavon viewed two lineups but did not identify anyone. When asked whether it was "possible" that the shooter was in the lineup, Mr. Pavon replied, "I don't know." Mr. Pavon also stated that he later testified before the grand jury.

¶ 42     Mr. Pavon testified that neither he nor Miguel had any weapons that evening.

¶ 43     On cross-examination, Mr. Pavon testified that displaying an upside-down rival gang sign indicates disrespect of the rival gang and that such signs of disrespect are common within the gang culture.

¶ 44     Taghfried Shalabi testified that on January 26, 2014, at 4:45 p.m., she was walking towards the convenience store at 30th Street and South Kedvale Avenue. As she walked, Ms. Shalabi heard three gunshots and turned into an alley to hide behind some garbage cans. Ms. Shalabi saw a black SUV turn into the alley where she was standing. Ms. Shalabi saw the driver, whom she later identified as codefendant, stop the car, look at her, and hit the gas. The vehicle, which she estimated was moving at about five miles per hour, drove straight at her, striking her wrist and stomach and causing her to fall into the garbage cans. The car driver acknowledged striking Ms. Shalabi by putting his hands up.

¶ 45     Ms. Shalabi remained pinned between the car and the garbage cans for about three minutes while the driver attempted to resume driving. The snow caused the tires to skid and the car's back end to fishtail. Eventually, the car pulled off.

¶ 46     A bystander called 911 for assistance. Ms. Shalabi was transported to Mount Sinai Hospital, where she was treated for her injuries and released. Her stomach and hands were bruised, and her left wrist was sprained. Photographs of Ms. Shalabi's injuries were admitted into evidence.

¶ 47    On February 4, 2014, Ms. Shalabi went to Area Central to view two lineups. She identified codefendant as the driver of the black SUV and defendant as the front seat passenger. She also identified defendant when she spoke with an assistant state's attorney and when she testified before the grand jury.

¶ 48    On cross-examination, Ms. Shalabi testified that she did not recall providing a statement in which she said that she saw a third person in the vehicle's rear seat.

¶ 49    On January 26, 2014, Detective James Adams and his partner, Detective Patrick Thelan, were assigned to investigate the victim's shooting. When Detective Adams arrived at 4124 West 30th Street, the victim had been pronounced dead, but his body had not yet been moved. Detective Adams testified that the victim sustained two shots to his chest and one to the midline area of his body. Detective Adams found three spent .410 shotgun casings and one live .410 shotgun shell on the street, just east of the victim's body.

¶ 50    After interviewing Mr. and Ms. Pavon, Detective Adams had a description of the shooter. He also knew that Ms. Shalabi was taken to Mt. Sinai Hospital to treat her injuries. Detective Adams investigated the alley where codefendant struck Ms. Shalabi with his car and observed knocked-over garbage cans and a tire track that ran alongside the cans.

¶ 51    On January 31, 2014, based on an interview conducted with Oscar Diaz, Detective Adams retrieved a picture of defendant from a computer system. He noticed that defendant fit the description of the shooter and generated a photo array that contained defendant's image.

¶ 52    On February 1, 2014, Ms. Pavon identified defendant from the photo array as the driver of the black SUV. That same day, Detective Adams obtained a search warrant for defendant's house at 2500 South Trumbull Avenue. Detective Adams testified that 2500 South Trumbull Avenue is Latin Kings gang territory, and defendant was a member of that gang.

¶ 53     The search warrant was executed on February 3, 2014. Nothing of evidentiary value was found in defendant's home. Defendant was arrested at his home and taken to Area Central Headquarters at 51st Street and Wentworth Avenue. On February 3, 2014, defendant did not have any facial tattoos.

¶ 54     That same day, Detective Roger Sandoval, accompanied by Detectives Joel Keller and Carlos Cortez, interviewed an individual named Maicont Bustos at 2939 West 25th Place. After speaking with Mr. Bustos, the detectives went to 2719 South Lombard Avenue to attempt to locate and arrest codefendant. The detectives had information that codefendant was known to drive a black GMC SUV that fit the description of the vehicle used in the murder.

¶ 55     Upon arriving at 2719 South Lombard Avenue, Detective Sandoval saw codefendant driving a black GMC Envoy SUV, which he parked in the garage. Certified vehicle records establishing that the vehicle was registered to codefendant at 2719 South Lombard Avenue in Cicero, Illinois, were later admitted into evidence.

¶ 56     Codefendant was arrested shortly after parking his car. A blue and black Apple iPhone was recovered from him. Detective Keller obtained a search warrant for the iPhone, and it was sent to the Regional Computer Forensic Laboratory.

¶ 57     Codefendant was placed in a separate interview room from defendant. Both rooms were equipped with working video cameras, and everything that transpired was recorded.

¶ 58     On February 4, 2014, Ms. Pavon viewed two separate lineups and identified defendant as the shooter and codefendant as the driver of the SUV that defendant exited from to kill the victim.

¶ 59     That same day, Ms. Shalabi also viewed the lineups and identified codefendant as the driver who struck her with his car and defendant as his passenger.

¶ 60    Defendant was fingerprinted and photographed at the 2nd District lockup at 10:50 p.m. on February 4, 2014.

¶ 61    The following day, February 5, 2014, at 9 p.m., Detective Adams was told that defendant wished to speak with him. Detective Adams went downstairs to the lockup and asked defendant if he wanted to talk to him. When the defendant said that he did, Detective Adams had defendant return to an interview room to record the interview. People's Exhibit No. 110, the video recording of the interview, was admitted into evidence and played for the jury.

¶ 62    In the detailed interview that followed, defendant tearfully recounted his actions on January 26, 2014. Defendant told Detective Adams that he did not want the detective to think he was a "cold-hearted killer" and wanted to repent.

¶ 63    Defendant told Detective Adams that his friend, Johnny Vargas, was shot and killed on Latin Kings territory for "no reason" by the Two-Six street gang. Vargas died in defendant's arms. Defendant was also shot during this incident. Had Vargas not been killed, the following day, January 27, 2014, would have been his birthday.

¶ 64    Defendant, codefendant, and others went to a cemetery where they drank and smoked marijuana and PCP. Codefendant drove them to "Giggles" house on Christiana Avenue in the "hood," and they continued drinking and smoking for about an hour. Defendant explained that he was "broken-hearted," "hurting," and in a "blind rage" thinking about Vargas. At one point, when defendant told codefendant that they should go to Two-Six territory, codefendant disagreed, saying that they were "high" and "drunk as hell." Codefendant, who had recently joined the gang, asked defendant, "what are we doing?" Defendant replied, "I don't know, man, it's my first time doing this shit, you know I'm saying so let's just do it for Johnny, he died in my arms man." Defendant told codefendant that they should "just go and see what happens."

¶ 65    Jose Orozco (Gizmo) asked defendant why he was upset. Defendant explained that it was on account of Vargas's death. The group ultimately agreed to go to Two-Six territory, and Gizmo gave defendant a shotgun and instructed him how to use it. The group went in two vehicles. Gizmo, Alan Torres (Reckless), and a third person rode in the first vehicle. Codefendant drove defendant, who sat directly behind codefendant in the rear seat with the shotgun.

¶ 66    The two cars drove to the corner of South Kildare Avenue and 30th Street, where defendant saw a "kid" standing outside of a vehicle. Defendant claimed that the kid flashed the Two-Six bunny gang sign. Defendant denied that he or his cohort flashed any gang signs. Codefendant told defendant, "Hey stupid ass, we could get the m*** f*** right here." Gizmo kept yelling at defendant to "do it" from the other vehicle.

¶ 67    Defendant opened the car door and "pressed the trigger and boom, boom." Defendant said that he fired the gun two times, striking the victim. Defendant said that he and codefendant were "highly nervous," and codefendant turned the car down an alley to drive away. Codefendant hit a lady who was grabbing her hand after being struck. After they drove away, defendant threw the shotgun over a fence around 21st Street and Pulaski Avenue in a "black" neighborhood.

¶ 68    Defendant denied pointing the gun at Ms. Pavon or her children. He told Detective Adams that he was no longer able to sleep and attempted suicide the night before by trying to suffocate himself with a wadded-up bunch of tissues, "but it didn't work." Defendant said, "What the f*** I did, it didn't bring Johnny Vargas back, it didn't solve nothing." Defendant was "repenting" because both his mother and the victim's mother would now be grieving in addition to Johnny Vargas's mother.

¶ 69    In the videotaped statement, defendant also can be seen speaking to himself when no one else was in the interview room. Among other things, defendant can be heard saying:

"DEFENDANT: My friend got killed, and I got shot in the middle of the f*** hood for no reason."

"I can't live like this – alone I can't live like this knowing this guilt is inside of me."

"This is not right what I did what they did to Johnny. It wasn't right. It wasn't right at all. Cost me my life and my daughter's life."

"I f*** hate this s***. I swear to God I hate it with a passion. All this shit for what? For What? For nothing. For what? For nothing."

"I f*** hate myself. My mother hates me. His mother hates me. *** Because I made a stupid a** decision. For nothing."

¶ 70 Officer Donald Frugoli, a forensic examiner with the Chicago Police Department, testified regarding the video clips and still photographs taken from codefendant's phone that were the subject of the pretrial motions. In accordance with the trial court's previous rulings, the video clips and photographs were admitted into evidence.

¶ 71 Sergeant John Foster testified regarding the previous gang-related murder of Johnny Vargas in March of 2012. Vargas, whose birthday was January 27, 1993, was a Latin Kings street gang member. On March 15, 2012, Vargas was shot in Latin Kings territory at 3008 South Saint Louis Avenue and died the following day. In conjunction with his investigation of the murder, Sergeant Foster interviewed defendant, who had sustained a graze wound to his head in the same incident. A Two-Six street gang member, Anthony Sodaro, was arrested for Vargas's murder.

¶ 72 Detective Adams identified a recent photograph of defendant that showed a tattoo on his face bearing the name "Maria," a tattoo on his left temple that said, "RIP Johnny," a tattoo bearing the number "5" on his left cheek, two tattoos on his right cheek, and a tattoo that said "Jasmine"

on his right jaw. Detective Adams also identified photographs that depicted tattoos on defendant's right arm and forearm.

¶ 73    On cross-examination, Detective Adams testified that defendant's videotaped statement was made 57 hours and 41 minutes after his arrest. Detective Adams spoke with defendant at least 10 times while he was held in the interview room. In response to being advised of his right to have an attorney, defendant asked Detective Adams, "what's an attorney?"

¶ 74    Inspector Franco Domma testified that the Cook County Sheriff's Office employed him. One of his responsibilities was to attempt to get information or intelligence within a facility to minimize incidents with inmates and civilian staff. On February 5, 2014, Inspector Domma received a call from Officer Ringler, another Cook County Sheriff's police employee. Codefendant had requested to speak to someone in internal affairs.

¶ 75    After Inspector Domma spoke with codefendant, he talked to Detective Adams. Detective Adams then shared what he learned from Inspector Domma with Detective James DiCicco.

¶ 76    Detective DeCicco testified that on February 6, 2014, he was assigned to go to an outdoor lot located at 1200 South Kilbourn Avenue to search for a shotgun used in a homicide. The lot owner of commercial property at 1247 South Kilbourn used for trucks allowed Detective DeCicco to search the property for the shotgun. That day, there was 1½ feet of snow on the ground, and it was snowing outside. Detective DeCicco did not find anything that day and asked the lot owner to inform him if he found anything when the trucks were moved.

¶ 77    On February 11, 2014, the lot owner called Detective DeCicco and informed him that a shotgun had been found. Detective DeCicco returned to the lot, and the owner gave him the shotgun, which was found at the west end of the lot.

¶ 78    The shotgun was turned over to evidence technician Jamal Judeh who inventoried it. Forensic testing revealed that the fired shotgun casings recovered from the scene of the murder were fired from the recovered shotgun. The parties stipulated that the shotgun was operable and that the fired shotshells in People's Group Exhibit No. 58 were fired from the shotgun.

¶ 79    The parties also stipulated that primer gunshot residue (GSR) was found in codefendant's car above the driver's side rear door. The presence of GSR indicated that this area was either in contact with a residue-related item or was in the environment of a discharged firearm.

¶ 80    The parties further stipulated that assistant medical examiner James Filkins would opine that the victim died due to multiple gunshot wounds that involved his heart, aorta, thoracic spine, and liver. The manner of death was homicide.

¶ 81    The jury convicted defendant of the first-degree murder of Miguel Navarette and found that defendant personally discharged the weapon that caused the death.

¶ 82                                      C. Sentencing

¶ 83    The trial court held a sentencing hearing. The trial court reviewed defendant's presentence investigation report (PSI). The PSI reflected that defendant was four months shy of turning 20 years old when he committed this offense. Defendant had numerous prior juvenile referrals for battery, reckless conduct, criminal defacing of property, robbery, gang loitering, criminal trespass to residence, and aggravated assault. Defendant received five years' juvenile probation for robbery on June 15, 2011. Defendant violated his probation and was sentenced to the Juvenile Department of Corrections on November 8, 2012.

¶ 84    Defendant was an "average student" and was suspended several times for fighting. Defendant, who was 25 years old at the time of sentencing, had a nine-year-old daughter with whom he had no contact.

¶ 85    Defendant reported that he had a good relationship with his parents until his father's death on January 1, 2019. Defendant had two sisters and one brother and got along well with his sister but had a "rocky" relationship with his brother. Defendant reported being a member of the Latin Kings street gang and having few good friends since his friends were all deceased.

¶ 86    Defendant was in good physical condition. Defendant was previously shot in the face but stated that he made a full recovery after six months.

¶ 87    When he was younger, defendant was seen by a mental health professional who diagnosed him with depression. Defendant denied having a problem with alcohol or illegal drugs. Defendant stated that he never drank alcohol but had smoked marijuana in the past. Defendant stated that he felt that he sometimes lacked control over events in his life because of influences around him during his childhood. Defendant felt peer pressured as a "kid."

¶ 88    The State presented the following evidence in aggravation.

¶ 89    Santo Phillips, an investigator with the Cook County Sheriff's Office, testified that defendant made a phone call on September 23, 2018, while detained in Division 9 of the Cook County Jail. He told his girlfriend, Jazmin Galeno, that a lawyer visited him. Defendant related that the lawyer stated that Detective Murphy was investigating a new case involving the murder of a Two-Six gang member from the area of 26th Street and Kolin Avenue. Defendant told Galeno that "Bart" got killed the day after Johnny Vargas was killed. Inspector Phillips testified that he heard defendant say that his lawyer told him that the police wanted defendant to try on a glove that the police found with seven bullets at 32nd Street and Harding Avenue. Defendant stated that "his Capon's," known as Miguel Rudey and Allen Torres, had DNA on those bullets. When Galeno asked defendant what she could tell the detectives, defendant provided several things that she could say.

¶ 90    Investigator Phillips also related a phone call that defendant had with his mother and his sister on December 4, 2018. In this conversation, defendant learned that his nephew, Carlito, was jumped at school by Latin Kings from 27th Street and South Drake Avenue. After learning this information, defendant arranged for a three-way conversation with an individual named "Temper" to get more information about this incident. Defendant told Temper about this incident and that he "wants something done about it."

¶ 91    In another conversation with his mother on December 4, 2018, defendant told her that she should pick up Carlito at school and have him point out to the Trumbull Kings the people responsible for Carlito being jumped. They would "smack the s*** out of those kids."

¶ 92    Investigator Phillips also testified regarding a phone call made by Christian Garcia, a member of the Two-Six street gang from the Cook County Jail, on December 3, 2018. Garcia called defendant's mother to tell her "that he is trying to stand on that business for him and get a hold of Amanda." Garcia reported that Amanda was the girl who had snitched on him. Investigator Phillips understood the phone calls to indicate that Garcia was trying to influence witnesses by helping defendant with the witnesses involved in his case. In turn, defendant was attempting to aid Garcia with influencing the witnesses against Garcia.

¶ 93    The Assistant Executive Director of the Cook County Jail, Steven Wilensky, also testified in aggravation. Mr. Wilensky testified that defendant had 53 recorded incident reports since his arrival at Cook County Jail on February 6, 2014. Defendant was repeatedly disciplined for: fighting with other inmates; exposing his penis to a female visitor; masturbating publicly; threatening officers at the jail; threatening to kill a county officer; issuing verbal threats to a reporting officer; refusing orders from officers; possessing contraband, including various metal objects and shanks; urinating; setting fires in his cell; and damaging property.

¶ 94    Defendant was also charged with public indecency based on an incident that occurred in the lockup during the pendency of this case. Assistant Public Defender (APD) Samantha French testified that she was assigned to the trial court's trial courtroom on October 19, 2017. On that day, APD French had a client who was being held in the court's lockup area. Defendant was in the holding cell with APD French's client that day. While APD French spoke with her client about his case, she observed defendant standing about three to four feet away from her with his pants around his thighs. Defendant's erect penis was exposed, and he was masturbating while glaring at APD French. Misdemeanor charges were brought against defendant as a result of this incident.

¶ 95    Defendant presented no witnesses in mitigation. Defense counsel relied on the PSI to argue mitigation. Defense counsel argued that to survive, defendant did not have a choice but to affiliate with a gang and that for the past year defendant did not have any disciplinary infractions while housed at the Cook County Jail. Defense counsel urged the court to impose a minimum sentence.

¶ 96    Defendant made a statement in allocution. He maintained his innocence and stated that many mistakes were made at trial. Defendant stated that he made mistakes as a youth because he was young and subject to a lot of peer pressure.

¶ 97    The trial court made lengthy factual findings before imposing a 50-year sentence on the charge of first-degree murder and a 25-year consecutive sentence for the firearm sentencing enhancement.

¶ 98                                    II. ANALYSIS

¶ 99    On appeal, defendant alleges that he was denied the effective assistance of counsel at trial and sentencing. With respect to trial, defendant alleges that defense counsel failed to ask any questions during *voir dire* and acquiesced to the admission of multiple instances of improper testimony. Alternatively, he maintains that we should review his forfeited claims for plain error.

Regarding sentencing, defendant maintains that trial counsel failed to present adequate mitigation evidence and urge that the imposition of a *de facto* life sentence was unconstitutional as applied to him.

¶ 100 On the other hand, the State maintains that defendant was not denied the effective assistance of counsel at trial or sentencing. Additionally, the State argues that defendant's claims of trial error are forfeited and not subject to review under the plain error doctrine.

¶ 101 For the reasons that follow, we agree with the State.

¶ 102          A. Defendant Was Not Denied the Effective Assistance of Counsel at Trial

¶ 103 Claims of ineffective assistance of counsel are evaluated under the two-pronged test announced in *Strickland v. Washington*, 466 U.S. 668 (1984), and adopted by our supreme court in *People v. Albanese*, 104 Ill. 2d 504, 525 (1984). Under *Strickland*, a defendant must show that his counsel's representation fell below an objective standard of reasonableness and that the deficient performance prejudiced his defense. *Strickland*, 466 U.S. at 687; *Albanese*, 104 Ill. 2d at 52.

¶ 104 Under the first prong of *Strickland*, defendant must prove that counsel made errors so serious and that counsel's performance was so deficient that counsel was not functioning as the "counsel" guaranteed by the sixth amendment. *People v. Griffin*, 178 Ill. 2d 65, 73-74 (1997). Counsel's performance is measured using an objective standard of competence under prevailing professional norms. The defendant must overcome the strong presumption that the challenged action or lack of action might have been the product of sound trial strategy. *People v. Sanchez*, 169 Ill. 2d 472, 487 (1996); *People v. Mahaffey*, 165 Ill. 2d 445, 457-58 (1995); *People v. Flores*, 153 Ill. 2d 264, 283 (1992).

¶ 105 Under the second prong of *Strickland*, the defendant must establish prejudice. The defendant must prove that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *People v. Patterson*, 2014 IL 115102, ¶ 81. A reasonable probability is one that is sufficient to undermine confidence in the outcome. *People v. Hale*, 2013 IL 113140, ¶ 18.

¶ 106 A defendant's failure to establish either proposition will be fatal to the claim. *Strickland*, 466 U.S. at 697. We can dispose of an ineffective assistance of counsel claim on either prong of *Strickland*. *People v. Janusz*, 2020 IL App (2d) 190017, ¶ 69. The trial court need not go further if defendant is unable to demonstrate prejudice. *People v. White*, 2011 IL 109689, ¶ 134.

¶ 107 In *People v. Everhart*, 405 Ill. App. 3d 687, 697 (2010), the defendant alleged that he was denied the effective assistance of counsel where his attorney failed to fulfill the promise made in opening statements that the defendant would testify and tell the jury what "really happened." The appellate court determined that it need not reach the question of whether trial counsel's conduct was deficient where the defendant failed to show resulting prejudice. *Id*.

¶ 108 The court found that the State's evidence of his guilt was overwhelming. *Id*. Such evidence included the defendant's post-arrest admission that he attacked the victim, forced her to remove her pants and bend down over the hood of her car, placed his penis inside her vagina against her will, and took her purse and discarded its contents as he drove away. The court concluded that the defendant failed to show how the outcome of his trial would have differed had he testified at trial or had his attorney not promised the jury that he would testify. *Id*.

¶ 109 In *People v. Thomas*, 164 Ill. 2d 410, 417 (1995), the defendant alleged, *inter alia*, that he was denied the effective assistance of counsel where his attorney failed to recognize the racial implications of his case where the defendant, a Black male, was accused of killing a White female.

The defendant alleged that counsel's incompetence was demonstrated by counsel's: (1) failure to attempt to prevent an all-white jury from sitting in judgment of him; (2) failure to question four jurors about their attitudes toward race; and (3) failure to formulate a defense strategy to minimize potential racial bias against him. *Id.* at 417-18. In support of his allegations of incompetence, the defendant relied on trial counsel's deposition testimony in which she testified that she did not believe racial implications are present in a case simply because a black man is accused of killing a white woman. *Id.* at 419.

¶ 110   Our supreme court found the defendant's claim lacked merit based on his failure to make a substantial showing of prejudice. *Id.* at 419. The court's rejection of the defendant's claim was based on its conclusion that the evidence of the defendant's guilt was overwhelming. *Id.* Such evidence included the defendant being placed at the crime scene, admitting to several persons that he was previously in the victim's garage, his oral and written confessions, and testimony that blood taken from his vest was the same type as the victim's and different from the defendant's. *Id.* at 419-20.

¶ 111   We have set forth a detailed recitation of the evidence adduced at trial, including the substance of defendant's lengthy videotaped confession which is based on our review of defendant's videotaped statement. Defendant neither challenges the admissibility of this evidence nor claims that its admission constituted ineffective assistance of counsel.

¶ 112   Defendant's videotaped custodial statement recounted in a detailed and highly emotional manner the murder itself as well as the events that preceded and followed its commission. While defendant denied exiting codefendant's car or threatening the Pavon family, the remaining details related by defendant generally dovetailed with the testimony given by Ms. Pavon, Mr. Pavon, and Ms. Shalabi.

¶ 113   Defendant's confession was corroborated by the three video clips and accompanying still photographs taken from codefendant's phone. Again, defendant does not allege that this evidence was wrongly admitted at trial nor that their admission resulted from the ineffective assistance of counsel. We have also reviewed these video clips and agree with the trial court's conclusion as to their probative value. As characterized by the trial court, the clips were:

"THE COURT: [P]robably some of the most probative evidence I've ever seen to certain issues in this particular case as to motive and the plan you know as to what was going to take place. It wasn't somebody's interpretation of what somebody else said. It was the defendant's own words, who was aware of where the defendant was when he was yelling out those threats and these challenges. Was it prejudicial? I[t] was extremely prejudicial to the defendant's interest of whether or not he was guilty beyond a reasonable doubt. All evidence which points to the guilt of an individual committing a horrific crime of murder is prejudicial to the Defense, to the defendant's desire not to be convicted, but this was so extraodinar[ily] probative of what occurred in this particular case, and what the plan was, and as to why 15-year-old Miguel is not with us anymore. It's all there.

And so as [the prosecutor] points out, the video not only puts the two defendants together, the driver of the vehicle that the defendant jumped out of to take the life of Miguel, but it also shows the vehicle in question that was, again, described by the eyewitnesses to the actual execution of Mr. Navarette."

¶ 114   The probative value of the video clips was enhanced by the gang evidence that was testified to by Mr. and Ms. Pavon and by Sergeant Foster. Mr. Pavon's explanation of the territorial boundaries of the Latin Kings and Two-Sixers coincided with the images depicted in the video

clips. Mr. Pavon explained what was meant by "false-flagging," which was a gesture that defendant made on the clips.

¶ 115   Sergeant Foster's testimony corroborated defendant's motive for shooting the victim; his desire to avenge the murder of Vargas on the near anniversary of what would have been Vargas' birthday. Again, defendant does not challenge the admissibility of this evidence or claim that its admission was the result of ineffective assistance of counsel.

¶ 116   The State also established that Ms. Pavon and Ms. Shalabi made lineup identifications of defendant and codefendant. While Ms. Pavon initially erroneously identified defendant as the driver in the vehicle based on her viewing of a photo array, just three days later, upon viewing the lineup, she immediately realized her mistake, which she then brought to the attention of the detectives. That Ms. Pavon was initially mistaken in believing defendant to be the driver finds direct support in defendant's confession. Likewise, any question of whether defendant was seated in the front passenger seat or the rear seat of the SUV when Ms. Shalabi was struck does not undermine the strength of her identification where defendant admitted to being present in the vehicle with codefendant when she was struck and did not indicate that a third individual was present in the vehicle.

¶ 117   The witnesses' accounts were corroborated by physical evidence. Gunshot residue was found in the rear driver's side of codefendant's car, the very spot where defendant was placed by the Pavons, and defendant himself in his videotaped confession. The State also established that the recovered shotgun was the weapon used to kill the victim.

¶ 118   As in *Everhart* and *Thomas*, viewed *in toto*, the evidence of defendant's guilt, in this case, was overwhelming. Despite his many allegations of error, defendant is unable to satisfy the

prejudice prong of *Strickland*. We conclude that defendant has failed to demonstrate that he was denied his right to the effective assistance of counsel.

¶ 119　　　　　　　B. Defendant's Alternative Request That We Review His
Claimed Errors Under the Plain Error Doctrine

¶ 120　We next consider defendant's alternative request that we review trial counsel's alleged failings under both prongs of the plain error doctrine.

¶ 121　　　　　　1. Review of Forfeited Claims Under the Plain Error Doctrine

¶ 122　To preserve an error on appeal, the defendant must object at trial and raise the issue in a written posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Failure to set forth the trial court's alleged errors and specify the grounds for a new trial in a posttrial motion constitutes a procedural default of the issue on review in the absence of plain error. *People v. Naylor*, 229 Ill. 2d 584, 592-93 (2008). Specifically, the plain error doctrine permits "a reviewing trial court to consider an unpreserved error when: (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred, and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007), (citing *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005)). Under either prong of the plain error doctrine, the burden of persuasion remains on the defendant. *People v. Bowman*, 2012 IL App (1st) 102010, ¶ 29, (citing *People v. Lewis*, 234 Ill. 2d 32, 43 (2009)).

¶ 123　For reasons that follow, we find defendant has failed to establish plain error under both prongs of the plain error doctrine.

¶ 124                          2. First-Prong Plain Error

¶ 125    Under the first prong of the plain-error doctrine, the defendant must show that "the evidence was so closely balanced [that] the error alone severely threatened to tip the scales of justice." *People v. Sebby*, 2017 IL 119445, ¶ 51. In determining whether the evidence was closely balanced, the reviewing trial court evaluates the totality of the evidence and conducts a qualitative, commonsense assessment of it within the context of the case. *Id.* ¶ 53.

¶ 126    Defendant cannot establish first-prong plain error for the same reason that he cannot establish ineffective assistance of counsel; he cannot demonstrate prejudice.

¶ 127    In *People v. White*, 2011 IL 109689, ¶ 130, the defendant alleged that after his right to counsel had attached, he was displayed in a lineup without his attorney being present. The defendant sought review of this claimed error under the closely balanced prong of the plain-error rule. *Id.* ¶ 131.

¶ 128    In rejecting the defendant's claim, the supreme court noted the similarity between the court's review of a forfeited claim under the closely-balanced-evidence prong of the plain-error doctrine and review of an ineffective assistance of counsel claim under the prejudice prong:

> "Plain error review under the closely-balanced-evidence prong of plain error is similar to an analysis for ineffective assistance of counsel based on evidentiary error insofar as a defendant, in either case, must show he was prejudiced: that the evidence is so closely balanced that the alleged error alone would tip the scales of justice against him, *i.e.*, that the verdict 'may have resulted from the error and not the evidence' properly adduced at trial (see *People v. Herron*, 215 Ill. 2d 167, 178 (2005) (plain error)); or that there was a 'reasonable

probability' of a different result had the evidence in question been excluded (see

*Strickland*, 466 U.S. at 694)." *White*, 2011 IL 109689, ¶ 133.

¶ 129  Where the record demonstrated how heavily the evidence weighed in favor of the State, the court determined that it need not resolve whether an error had occurred because the defendant was unable to demonstrate resulting prejudice. *Id.* ¶ 134. The trial court found whether the issue was reviewed as an ineffective assistance of counsel claim, or one based on the closely-balanced-evidence prong of the plain error doctrine that:

> "[t]here is no reason to go further for purposes of either an ineffective assistance analysis or one founded upon the closely balanced prong of plain error. Both analyses are evidence-dependent and result-oriented. Even if we were to assume, *arguendo*, there was error in the admission of evidence concerning the lineup, the evidence against defendant is such that he cannot show prejudice for purposes of either analysis." *Id.*

¶ 130  Based on *White*, we find that defendant's failure to establish prejudice under the second prong of *Strickland* necessarily means that he is unable to establish prejudice under the first prong of the plain error doctrine. Therefore, to the extent that defendant seeks review of his claims under the closely-balanced-evidence prong of the plain error doctrine, we deny his request.

¶ 131                                     3. Second-Prong Plain Error

¶ 132  Defendant also requests review of his claims under the second prong of the plain error doctrine, asserting that his alleged errors "created a pervasive pattern of unfair prejudice." Under the second prong of the doctrine, prejudice is presumed if the defendant can show that the claimed error was so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process. *People v. Sebby*, 2017 IL 119445, ¶ 50. Prejudice to the defendant is

presumed because of the importance of the right involved, regardless of the strength of the evidence. *People v. Herron*, 215 Ill. 2d 167, 178-79 (2005). "A reviewing trial court will grant relief under the second prong of the plain error rule only if the error is so fundamental to the integrity of the judicial process that the trial court could not cure the error by sustaining an objection or instructing the jury to disregard the error." *People v. Vargas*, 174 Ill. 2d 355, 363-64 (1996).

¶ 133   Very few trial errors meet the standard for second-prong plain error. Second-prong plain error is generally equated with "structural error." *People v. Thompson*, 238 Ill. 2d 598, 613-14 (2010), (citing *People v. Glasper*, 234 Ill. 2d 173, 197-98 (2009). Structural error is a "systematic error which serves to 'erode the integrity of the judicial process and undermine the fairness of the defendant's trial.' " *Glasper*, 234 Ill. 2d at 197-98 (quoting *People v. Herron*, 215 Ill. 2d 167, 186 (2005)).

¶ 134   In *Thompson*, our supreme court discussed the limited class of structural errors as including: (1) a complete denial of counsel; (2) trial before a biased judge; (3) racial discrimination in the selection of a grand jury; (4) denial of self-representation at trial; (5) denial of a public trial; and (6) a defective reasonable doubt instruction. *Thompson*, 238 Ill. 2d at 609, (citing *Washington v. Recuenco*, 548 U.S. 212, 218 n. 2 (2006)).

¶ 135   In *People v. Blue*, 189 Ill. 2d 99, 139 (2000), the court held that when the cumulative effect of errors that cast doubt upon the reliability of the judicial process creates a "pervasive pattern of unfair prejudice to defendant's case" that they may be regarded as structural error under the second prong of the plain error rule.

¶ 136   In *People v. Johnson*, 208 Ill. 2d 53, 64 (2003), the trial court reiterated that "a pattern of intentional prosecutorial misconduct may so seriously undermine the integrity of judicial proceedings as to support reversal under the plain-error doctrine."

¶ 137   We reject defendant's attempt to bring himself under the umbrella of structural error as described in *Blue* and *Johnson*, based on his charge that the magnitude of the alleged errors, in this case, affected the integrity of the trial and "created a pervasive pattern of unfair prejudice." This case bears no factual resemblance to the facts of those cases.

¶ 138   In *Blue*, the defendant's allegations of trial error included: (1) the State, over objection, displaying a life-size mannequin clothed with the deceased officer's uniform which was bloodied and brain-splattered; (2) the State arguing that the deceased officer's family and the police "needed to hear" from the jury; and (3) the State "testifying" through thinly-veiled "objections," to defense counsel's examination of a witness after having elicited hearsay testimony during direct examination. *Blue*, 189 Ill. 2d at 120-21, 126-27, 135-36. Further, the defendant alleged as error the trial court's refusal to ask potential jurors if they would automatically sentence him to death for killing a police officer. *Id*. at 119, 135.

¶ 139   With respect to the defendant's first claim, which trial counsel preserved, the court found that while display of the uniform was nominally probative of a material fact, its potential prejudice outweighed its probative value where it was "the actual remnants of the scene itself, spattered with the actual blood and brains of the victim." *Id*. at 125-26. The error was exacerbated by the jury's extended exposure to the mannequin, which culminated in the trial court furnishing the jurors with gloves that "appeared to encourage the jury to engage in a tactile interaction with the uniform." *Id*. at 126.

¶ 140   The court then considered the defendant's unpreserved claims of prosecutorial misconduct based on remarks made by the State during its rebuttal closing argument. First, the court determined that the State improperly "appealed directly to the jurors' passions and prejudices by urging the jury to use its verdict to send a message to [the officer's] family and to the police." *Id.* at 133. The error was compounded where a Commander of the Chicago Police Department testified that he attended the deceased officer's "star ceremony," read aloud the oath of office that the deceased officer took during the ceremony and testified that the deceased officer's police badge was retired and displayed in the "honored star case" at Chicago Police Department Headquarters. *Id.*

¶ 141   The court found that the State improperly remarked on the pain endured by the victim's parents in the loss of their only child. *Id.* at 130. The inflammatory impact of this improper argument was enhanced by the introduction of evidence designed to "highlight the poignancy of the [deceased officer's] family's loss and to suggest to the jury that the family's pain could be alleviated by a guilty verdict." *Id.* at 131.

¶ 142   Based on a thorough review of the record and controlling case law, the court found that the defendant was denied his due process right to a fair trial and that a combination of errors may have coerced the jury into returning a verdict grounded in sympathy, a possibility that called into doubt the constitutionality of the defendant's trial. *Id.* at 120.

¶ 143   In *Johnson*, the trial court found misconduct similar to that in *Blue* was engaged in in the trial of Blue's two codefendants. *Johnson*, 208 Ill. 2d at 74-75. In affirming the appellate court's reversal of the codefendant Parker's convictions, the trial court held:

    "As in *Blue*, we see in this case cumulative error and a pervasive pattern of

    unfair prejudice that denied defendant a fair trial and cast doubt upon the reliability

of the judicial process. [Citation.] We note that the prejudice in this case, as in *Blue*, was engendered in the main by prosecutorial misconduct. As in *Blue*, the coalescence of improper, emotion-laden evidence, and inflammatory argument obviously designed to exploit that evidence, created a synergism of parallel errors. [Citation.] As in *Blue*, a new trial is necessary in this case to preserve and protect the integrity of the judicial process, as "the trial court allowed the guilty verdict to rest on considerations other than the evidence alone." [Citation.] *Johnson*, 208 Ill. 2d at 84.

¶ 144 We note a factual distinction between this case and *Blue* and *Johnson* at the outset. Unlike those cases, defendant makes no freestanding claim of prosecutorial misconduct based on improper closing argument. Indeed, this is the common feature of *Blue* and *Johnson* and was integral to the court's determinations that structural error was established such that new trials were required.

¶ 145 To be clear, we are not suggesting that structural error requires both prosecutorial misconduct in closing argument and the State's introduction of improper evidence. Indeed, in *People v. Ray*, 126 Ill. App. 3d 656, 663 (1984), the appellate court determined that the State's closing argument, standing alone, constituted second prong plain error. However, we believe that the exception announced in *Blue* should be construed narrowly and not applied simply based on the sheer number of forfeited claims raised on appeal or because defendant alleges the forfeited errors "created a pervasive pattern of unfair prejudice." In *Johnson*, the court specified that "[t]he common threads that bind these cases for purposes of appeal are alleged patterns of prosecutorial misconduct *and related trial error*." *Johnson*, 208 Ill. 2d at 62.

¶ 146 With this understanding in mind, we find defendant's claim of second-prong plain error fails where his alleged errors do not display a pattern of prosecutorial misconduct. We now address defendant's claims of error to support our conclusion.

¶ 147        a. Defense Counsel's Failure to Ask Questions During *Voir Dire*

¶ 148 First, defendant's claim that defense counsel was ineffective for failing to ask any questions during *voir dire* cannot support second-prong plain error review where it is not fairly attributed to any action by the State. Defendant's apparent reliance on the court's pretrial rulings allowing gang evidence to be admitted at trial and remarks made by the State concerning such evidence does not make this claim subject to plain error review, where no error is alleged in either the court's pretrial rulings on the admissibility of gang evidence or remarks made by the State relating to this evidence.

¶ 149 Thus, defendant's claim remains one restricted to review under *Strickland*. As we have previously noted, defendant is unable to satisfy the second prong of *Strickland* where the evidence of his guilt was overwhelming.

¶ 150 Furthermore, this claimed error may not be characterized as "structural," where the decision to question a potential juror on a particular subject is a matter of trial strategy. *People v. Fudge*, 332 Ill. App. 3d 1019, 1026 (2002). Such strategy decisions are virtually unchallengeable. *People v. Palmer*, 162 Ill. 2d 465, 476 (1994). Reviewing court should be highly deferential to jury selection decisions involving trial strategy. *People v. Manning*, 241 Ill. 2d 319, 333 (2011).

¶ 151 Defendant's suggestion that defense counsel be presumed incompetent for failing to ask gang bias questions in a gang-related offense inverts the presumption of competency that is a centerpiece of *Strickland*. *Strickland*, 466 U.S. at 689. It is also irreconcilable with our supreme court's holding in *Manning*.

¶ 152   In *Manning*, the court rejected the defendant's ineffective assistance of counsel claim where defense counsel failed to remove a juror who stated that he believed that sex offenders should be locked up for life. *Manning*, 241 Ill. 2d at 334-35. The court noted that:

> "[d]efendant's attorney was faced with a difficult case, given the strong evidence against defendant, and his chosen strategy reflected that difficulty. Highlighting defendant's sex offender status was a risky choice, given largely negative views of sex offenders by the general public. Based upon his decisions as to when to exercise peremptory challenges, it does not appear that counsel expected prospective jurors to be able to completely put those views aside." *Id*. at 335.

¶ 153   *People v. Strain*, 194 Ill. 2d 467 (2000), does not support defendant's claim. *Strain* does not negate the fact that defense counsel retains the power to decide, as a matter of trial strategy, how to approach *voir dire*. *Strain* does not affirmatively require that defense counsel inquire whether potential jurors are prejudiced against street gangs because gang evidence will be admitted at trial. Similarly, the trial court is not obligated to question prospective jurors, *sua sponte*, about potential prejudice against gangs. *People v. Campbell*, 2012 IL App (1st) 101249, ¶ 28.

¶ 154   In conclusion, we reject defendant's reliance on counsel's failure to ask any questions during *voir dire* as a basis for us to find resulting structural error in this case.

¶ 155                    b. Defendant's Claim That Improper Life and Death
                              Testimony Was Given at Trial

¶ 156   We next address defendant's contention that the State elicited improper testimony from the victim's mother designed to garner sympathy for the victim. Defendant's claim is premised on the following question and response:

"THE STATE: When you last spoke to Miguel, how did you leave things with him on the phone?

MS. NAVARETTE: The last time we spoke, he said he wanted to go see us. That he missed us a lot. That he wanted to see his brothers and he wanted to give me a letter for one of his other brothers. And he asked me for the phone numbers of all his aunts and uncles."

¶ 157   We reject defendant's claim that the State's "question served no purpose other than to prey on the sympathy of the jury." We agree with the State that, placed in context, this question "was better understood as a question asking whether Ms. Navarrete expected Miguel to follow through with his plan to visit the family, and what time he was expecting to arrive."

¶ 158   While admitting that the question was "open-ended," defendant maintains that the "risk was obvious that the State could seek the jury's sympathy with irrelevant evidence." We do not ascribe prosecutorial overreaching to the State's question.

¶ 159   While defense counsel did not object to this testimony at trial, defendant's motion for new trial claimed that Ms. Navarette's testimony was elicited "only to incite sympathy [over] the loss of her son." The trial court rejected this claim, finding that the State's direct examination "was limited to the appropriate life and death nature of her testimony regarding her son and how she learned of his passing."

¶ 160   The admission of evidence is within the trial court's sound discretion, whose ruling is reviewed for an abuse of discretion. *People v. Becker*, 239 Ill. 2d 215, 234 (2010). An abuse of discretion occurs when the trial court's decision is arbitrary, fanciful, unreasonable, or when no reasonable person would have taken the same view as the trial court. *People v. Morris*, 2013 IL App (1st) 110413, ¶ 47.

¶ 161   A distinction exists between cases where the jury is made aware of the family left behind and cases where the prosecution dwells upon the deceased's family to the point that the jury would relate that evidence to the defendant's guilt. *People v. Sandifer*, 2016 IL App (1st) 133397, ¶ 58, (citing *People v. Jones*, 2011 IL App (1st) 092529, ¶ 33.))

¶ 162   In *People v. Harris*, 225 Ill. 2d 1 (2007), our supreme court considered the proper scope of life and death witness testimony. The court noted that introductory, foundational questions regarding the witness's background are not improper. *Id*. at 32. Nor is the testimony of surviving victims describing their own personal backgrounds. *Id*. at 31-32. However, testimony that a deceased has left a family is prejudicial if presented in such a manner to cause the jury to believe it is material. [Citation.] *Id*. at 31. Likewise, an argument that dwells upon a decedent's family or attempts to relate a defendant's punishment to such family is improper. [Citation.] *Id*.

¶ 163   We find no basis for concluding that the trial court abused its discretion in determining that Ms. Navarette's testimony was not prohibited. The record does not support the conclusion that the State's open-ended question was designed to do more than establish that Ms. Navarette expected to see Miguel the following day. Nor was the testimony highlighted during the State's closing argument. We find the testimony to have been incidental and not material to defendant's guilt and therefore not to support defendant's claim of structural error.

¶ 164                          c. Admissibility of Lineup Photographs

¶ 165   Defendant alleges that the State improperly introduced into evidence a prejudicial lineup photograph that displayed him wearing a shirt that read, "if you turn your head to read this, you owe me a blow job." While defendant admits that identity was at issue in this case and that Ms. Pavon's identification of him was a critical issue where she initially identified him as the car driver, he maintains that this particular photograph was unnecessary or that it should have been redacted.

¶ 166    In the absence of any objection to the introduction of this evidence and in light of its clear relevance, we reject defendant's claim that this "error" should be regarded as implicating structural error.

¶ 167    Evidence will be deemed admissible when relevant to a disputed issue if its prejudicial effect does not substantially outweigh its probative value. *People v. Patterson*, 192 Ill. 2d 93, 114-15 (2000). We agree with the State that the full-bodied picture of defendant assisted the jury in determining his size, height, and build in a way that the other photographs did not. As such, the lineup photographs were relevant evidence.

¶ 168    Insofar as the "prejudicial" nature of the photograph is concerned, we also agree with the State that while the shirt worn by defendant can be characterized as "inflammatory" and "crude," we cannot say that this photograph resulted in prejudice to defendant. Nor does the record support the conclusion that the State sought to put this evidence before the jury to engender prejudice against defendant.

¶ 169                                    d. Admission of the 911 Call

¶ 170    Defendant maintains that the State's "only purpose" for seeking to admit the 911 call by Mr. Pavon into evidence was "to prey on the jurors' sympathy by giving them a real-time look at the horror of the Pavons watching Miguel die." We disagree with defendant's assertion of prosecutorial overreaching and reliance on *People v. Smith*, 2017 IL App (1st) 143728, to support his contention.

¶ 171    *Smith* is distinguishable for two fundamental reasons. First, in stark contrast to this case, in *Smith*, the trial court noted that "whether defendant committed the acts that resulted in [the victim's] death was not at issue ***." *Id.* at 58. Second, in *Smith*, the defendant objected to the

introduction of the 911 call as being unduly inflammatory and prejudicial. *Id.* at 64. The defendant's preserved allegation of error found support in the 5½ minute 911 call that was introduced at trial where "crying and mostly unintelligible screaming is heard in the background." *Id.* at 65.

¶ 172  In contrast to *Smith*, identification was the issue to be resolved by the jury in this case. We have listened to the 911 call and find it to have been probative of that contested issue. While Ms. Pavon is heard crying in the background, Mr. Pavon is heard telling her, "[h]e's gone baby, he's gone baby, he's gone," and both repeatedly implore the victim to "wake up," the call was clearly relevant. It described what Mr. Pavon witnessed while attempting to get an ambulance to attend to the victim who was shot and dying. Mr. Pavon described: (1) the two cars involved in this incident, (2) the ethnicity of the individuals, (3) the weapon that was used to shoot the victim, (4) the shooter as being in the back of the black SUV, and (5) the direction that the SUV's headed after the victim was shot. The record affirmatively refutes defendant's claim that this evidence's primary purpose was to inflame the jury.

¶ 173  Nor would this evidence be likely to improperly inflame the jury given the remaining properly admitted evidence of defendant's guilt. *People v. Jurczak*, 147 Ill. App. 3d 206, 214 (1986) (declining to find error based on the admission of a 911 tape "when the jury was also confronted with the defendant's own description of the stabbing, the testimony of the police officers who found the body within minutes of the killing, and the photographs of the victim's body and the bloody scene.")

¶ 174  As such, we reject defendant's claim that the introduction of this unobjected-to evidence shows prosecutorial overreaching that supports second-prong plain error review of his contentions of error.

¶ 175    e. Defendant's Remaining Hearsay Claims Based on Allegedly Improper
Prior Consistent Statements, Testimony That Exceeded the Course-
of-Investigation Exception, and Irrelevant Evidence

¶ 176   Based on our review of the record and applicable law, with one exception, which will be considered shortly, we find that defendant's remaining claims of error are run-of-the-mill hearsay claims that do not fall under the umbrella for second-prong plain error because they are not suggestive of pervasive prosecutorial misconduct.

¶ 177   Our conclusion finds direct support in *People v. Temple*, 2014 IL App (1st) 111653, ¶¶ 26, 49, 52. As in this case, in *Temple*, the defendant argued alternatively that his claimed errors resulted from ineffective assistance of counsel or constituted plain error under both prongs of the plain-error doctrine. The appellate court found that the defendant's claims of error based on the admission of prior consistent statements and police testimony that exceeded the course-of-investigation exception did not fall under the "umbrella of structural error" and declined to consider them further. *Id.* ¶ 51.

¶ 178   As in *Temple*, we find that defendant's claims relating to the unobjected-to admission of (1) allegedly prior consistent statements by Mr. and Ms. Pavon and Ms. Shalabi; (2) irrelevant evidence; (3) improper leading questions; and (4) police testimony that allegedly exceeded the course-of-investigation exception are not properly regarded as structural error.

¶ 179   Our conclusion is not altered by *People v. Wheeler*, 186 Ill. App. 3d 422 (1989), which we find to be distinguishable. In *Wheeler*, the appellate court considered the defendant's forfeited interrelated claims of structural error arising from the State's introduction of evidence of prior consistent statements and remarks during closing argument that highlighted such evidence. *Id.* at 426. At trial, the victim, who was impeached with his prior convictions, was permitted to testify

that he made a prior consistent statement to the police. *Id.* The prosecutor bolstered the witness's testimony by referencing the prior consistent statement during closing argument, actually interjecting his personal belief that such testimony was accurate and asking the jury to return a guilty verdict based thereon. *Id.* The court found that the combination of the improper testimony and improper commentary bolstering it was plain error where the proof of the defendant's guilt depended almost entirely on such testimony. *Id*. 427-28.

¶ 180   Here, as we have previously noted, defendant makes no freestanding claim of prosecutorial error based on the State's closing argument. As previously discussed, defendant's guilt did not hinge on the credibility of Ms. Pavon, Mr. Pavon, or Ms. Shalabi. Thus, *Wheeler* does not support defendant's claim that the introduction of allegedly hearsay testimony should be regarded as supporting his claim of structural error.

¶ 181                              f. Inspector Domma's Testimony

¶ 182   We choose to address the merits of one alleged error in the admission of hearsay evidence because defendant claims that this error was exacerbated by a remark made during the State's closing argument. Specifically, defendant contends that the course-of-investigation exception was exceeded by Inspector Domma's testimony about how he came into possession of the shotgun used to kill the victim. Defendant alleges that "[t]he State violated [defendant's] constitutional right to a fair trial when it elicited from Investigator Domma that [defendant's] non-testifying co-defendant, Andres Guerra, confessed to the location of the gun." Defendant further alleges that the State then "highlighted the most damaging aspect of it in closing argument" when it remarked: "How did we get the gun? Well, they went looking for it after Investigator Domma had a conversation with Andres Guerra."

¶ 183  We disagree with defendant's characterization of Inspector Domma's testimony and his suggestion that the State heightened the alleged error in closing argument.

¶ 184  A police officer's testimony regarding another's statements, or nonverbal conduct is not hearsay if offered to explain the steps in his investigation of a crime. *People v. Simms*, 143 Ill. 2d 154, 174 (1991). Even if it suggests that a nontestifying witness implicated the defendant, such testimony is admissible. *Id*. The exception allows the introduction of such evidence even if the information is derived from a co-offender. *People v. Williams*, 52 Ill. App. 3d 81, 87-88 (1977). Where the officer does not testify to the confession or statement of a codefendant which implicates the defendant in a crime, *Bruton v. United States*, 391 U.S. 123 (1968), is not violated. *People v. Dixon*, 133 Ill. App. 3d 1073, 1083 (1985).

¶ 185  Inspector Domma did not testify that codefendant "confessed to the location of the gun." In point of fact, Inspector Domma did not testify as to anything that codefendant said. To the extent that the jury could infer that codefendant provided the location of the shotgun, such inference was permissible. *Simms*, 143 Ill. 2d at 174.

¶ 186  Our conclusion finds support in *In re E.H.*, 299 Ill. App. 3d 42 (1998). In *E.H.*, the respondent was adjudged delinquent of first-degree murder. On appeal, he alleged that hearsay testimony was improperly admitted at trial, where an officer testified that after he spoke with the respondent's mother, she accompanied him to a park. *Id*. at 50-51. Upon exiting the police vehicle, she pointed to an area where he found a pistol. *Id*. The court rejected the respondent's claim of error, finding the evidence admissible to show the course of the officer's investigation. *Id* at 51.

¶ 187  However, the court found that the State's closing argument exceeded that legitimate purpose where it drew an improper hearsay inference from the testimony. *Id*. at 52. Nevertheless, the court affirmed the respondent's conviction based on its conclusion that the trial court did not

rely on any hearsay inferences to find the respondent guilty beyond a reasonable doubt. *Id*. As such, the prosecutor's closing argument did not prejudice the respondent. *Id*.

¶ 188    Turning to the single and fleeting remark that defendant relies on to support his claim of error, the remark did not address the substance of what codefendant said. The inference raised in the State's remark is the same inference that the testimony itself permitted.

¶ 189    Even if the remark highlighted the inference, the State's remark did not rise to the level of second-prong plain error where defendant's custodial statement established that defendant tossed the gun out of codefendant's car while the two were driving away from the scene of the crime. Moreover, during the statement, defendant was specifically confronted with his codefendant's statement wherein he informed the police that the gun was disposed of in the area of 22nd Street and Cicero Avenue. Defendant did not disagree with codefendant's assessment of the location where the gun was thrown away. Therefore, at most, the alleged inference drawn by the State during closing argument was cumulative to what was already before the jury.

¶ 190    The facts of this case bear no resemblance to those in *People v. Ochoa*, 2017 IL App 1st 140204. In *Ochoa*, after the appellate court remanded the matter for a second retrial of the defendant based on a *Bruton* violation, the State committed the same error by introducing an array of evidence that went beyond the course-of-investigation exception. *Id*. ¶ 36. Defense counsel interjected objections to some of the evidence, which included police testimony regarding learning the defendant's gender, ethnicity, nickname, build, and home address after speaking with his three codefendants. *Id*. ¶ 54. The court noted that, as in the prior trial, such testimony strongly inferred that the defendant's three codefendants implicated him to the police. *Id*. ¶¶ 52-53.

¶ 191    The court also found that the State's objected-to closing argument reinforced the repeated error where it linked the defendant's confession to the fact that his codefendants were arrested and

were in custody upon his arrival at the police station and gave the jury reason to infer that the description testified to by the police that included the defendant's gender, ethnicity, nickname, build, and home address, was provided to them by the three codefendants. *Id*.

¶ 192   The evidence and argument in *Ochoa* are clearly distinguishable from the testimony given by Inspector Domma and the State's closing argument based on that testimony. For the reasons previously discussed, we reject the notion that this alleged error is properly regarded as one that could conceivably render defendant's trial fundamentally unfair or unreliable or challenge the integrity of the judicial process. *Piatkowski*, 225 Ill. 2d at 565.

¶ 193        4. Defendant Was Not Denied the Effective Assistance of Counsel at Sentencing

¶ 194   Next, we consider defendant's claim that he was deprived of the effective assistance of counsel at sentencing. Defendant maintains that counsel was deficient for failing to present "any mitigating evidence" and that prejudice resulted where he received a 75-year *de facto* life sentence.

¶ 195   The State maintains that defendant has failed to establish either that trial counsel was deficient during the sentencing hearing or that the trial court would have imposed a different sentence had trial counsel not performed deficiently. We agree with the State.

¶ 196   The test established in *Strickland* also applies to the sentencing phase of a defendant's trial. *People v. Franklin*, 167 Ill. 2d 1, 25 (1995); *People v. Rebecca*, 2012 IL App (2d) 091259, ¶ 107. The defendant must demonstrate a reasonable probability that, but for counsel's unprofessional errors, his sentence would have been different. *Laflin v. Cooper*, 566 U.S. 156, 165 (2012). Even when counsel's performance is deficient based on his failure to investigate mitigating evidence and present it at sentencing, the defendant must demonstrate resulting prejudice. *People v. Pulliam*, 206 Ill. 2d 218, 239 (2002).

¶ 197                              a. Ineffective Assistance of Counsel / *De Facto* Life Sentence

¶ 198   We first address defendant's claim that trial counsel should have made an argument that "a

*de facto* life sentence for [defendant], just one year over the age of adulthood, would violate the

Illinois Constitution's proportionate penalties clause."

¶ 199   In *Miller v. Alabama*, 567 U.S. 460, 471-80 (2012), the United States Supreme Court held

that mandatory life sentences imposed on juvenile offenders (those under the age of 18 at the time

of the offense) violate the eighth amendment in the absence of consideration of the mitigating

aspects of youth, *i.e.*, immaturity, impulsivity, and increased vulnerability to negative influences.

¶ 200    In *People v. Reyes*, 2016 IL 119271, ¶ 8, the court held that the *Miller* rationale applies to

*de facto* life sentences.

¶ 201   In *People v. Holman*, 2017 IL 120655, ¶ 40, our supreme court held that *Miller* also applies

to discretionary life sentences.

¶ 202   In *People v. Buffer*, 2019 IL 122327, ¶¶ 27, 40-41, our supreme court defined a *de facto*

life sentence for a juvenile as a sentence in excess of 40 years' imprisonment.

¶ 203   The foregoing principles were relied on in *People v. Thompson*, 2015 IL 118151, ¶¶ 38,

44, and *People v. Harris*, 2018 IL 121932, ¶¶ 44, 48, as a basis for alleging that a *de facto* life

sentence imposed on a young adult offender may be unconstitutional as applied under the

proportionate penalties clause of the Illinois Constitution.

¶ 204   The proportionate penalties clause of the Illinois Constitution provides that "[a]ll penalties

shall be determined both according to the seriousness of the offense and with the objective of

restoring the offender to useful citizenship." Ill. Const. 1970, art. 1, § 11. A sentence violates the

proportionate penalties clause if "the punishment for the offense is cruel, degrading, or so wholly

disproportionate to the offense as to shock the moral sense of the community." *People v. Miller*, 202 Ill. 2d 328, 338 (2002). The proportionate penalties clause provides broader protections than those provided in the eighth amendment. *People v. Gipson*, 2015 IL App (1st) 122451, ¶¶ 69-78. *People v. Clemons*, 2012 IL 107821, ¶ 36.

¶ 205    Based on the court's holding in *Thompson* and *Harris*, a young adult offender may rely on the evolving neuroscience and societal standards underlying the rule in *Miller* as a basis for bringing an as-applied challenge to the constitutionality of a *de facto* life sentence under the proportionate penalties clause. *Thompson*, 2015 IL 118151, ¶¶ 38, 44; *Harris*, 2018 IL 121932, ¶¶ 44, 48. As the court noted in *People v. Evans*, 2021 IL App (1st) 172809, ¶ 16, these rulings "opened the door for young adult offenders to demonstrate that their own specific characteristics at the time of their offense were so like those of a juvenile that the imposition of a life sentence, absent the safeguards established in *Miller*, violates the proportionate penalties clause."

¶ 206    Here, defendant's claim fails where the record reflects the fact that the trial court acknowledged that defendant fell within the class of young offenders and considered the potential applicability of *Miller* to his circumstances:

> "THE COURT: And so another thing that I felt appropriate was to review the statutory law that is now in effect, which speaks of sentencing individuals under the age of 18 at the time of the commission of the offense. I know the defendant is not under 18, he was over 19-and-a-half years, I believe, by my calculations at the time of the offense, but still there is language there given the fact that the defendant was only a year and a half removed from that having the benefit of that particular law. So he's still a young person. And I think youth is always something to be taken

into consideration. So that's why I wanted to also look at that particular statute which is now in effect."

¶ 207   After expressing its intent to consider defendant's youth in fashioning a sentence, the trial court made factual observations that negated the notion that defendant should be regarded as akin to a juvenile: (1) defendant was the shooter; (2) defendant's actions were entirely unprovoked by the victim; and (3) defendant had an extensive history of delinquency which included a failed probationary term that resulted in a sentence in the Juvenile Department of Corrections. The court further relied on: (1) the video clips; (2) defendant's violations at the Cook County Jail after being placed in pretrial detention in Cook County Jail; (3) defendant's act of masturbating in the presence of an assistant public defender in the lockup behind the courtroom; and (4) phone calls made by defendant and Christian Garcia to defendant's mother during defendant's pretrial detention in imposing sentence.

¶ 208   The trial court again referenced the sentencing parameters for juveniles in imposing sentence:

"THE COURT: As I said, I've reviewed the sentencing considerations for someone who's younger than Mr. Miranda under 18, I have considered his age, I mean he was 19-and-a-half. What were his ability to consider the risk and the consequences of his behavior."

¶ 209   The trial court went on to make the following factual findings. Defendant's actions were premeditated where the video clips showed him to be the primary actor who went to Two-Six territory at 3:30 a.m. "asserting his dominance." While defendant's videotaped statement and exchange between defendant and codefendant while the two were in nearby holding cells revealed an expression of remorse, and the videotape was "compelling and moving," any "semblance of

hope" "went out the window" at the Cook County Jail. The trial court described defendant's actions there as a four-year "rampage" that demonstrated defendant's unwillingness to change or leave gang life. Defendant was not "succumbing to peer pressure" but "exerting peer pressure." Defendant was the "killer" of the gang. The circumstances leading up to and surrounding this crime showed that defendant planned this crime and was the individual armed with the shotgun used to kill the victim.

¶ 210    The trial court again returned to the question of whether the sentencing considerations for juveniles applied in this case:

> "THE COURT: So many of the juvenile cases which come back before this trial court for resentencing because individuals who were 15, 16 years of age got involved in criminal behavior that caused them to be sentenced to natural life in prison, when they were lookouts. That's a consideration, but his specific role is that he was the offender. He was the guy that planned it. He was the main actor. He's the gunman. He's the shooter. Nobody else got out of the car with a gun. They got out of the car with their fingers and did their little gang signs by waving their hands in the air, but he was empowered because he had that firearm."

¶ 211    The trial court also considered whether anything about defendant's childhood supported treating defendant as a juvenile:

> "THE COURT: There's no history of parental neglect. There's no history of physical abuse. No history of childhood trauma. I know he lost his father, but he lost his father a year ago. His father was alive and well and providing support for him and the other members of the family, I assume at the time when this offense

occurred. I see the family members come to court. They're here. Gang bangers aren't here. His family is here. The Kings have better things to do.

The circumstances of the offense that they need not be restated again, his participation of his role in the offense is clear. We've covered that. Was he able to participate in his defense, yes, he was. Clearly he was. He hasn't been prevented in any way. He does have a prior juvenile history. So none of these things [inure] to the favor of the defendant as it turns out to make the court try to impose the most minimal of sentences."

¶ 212  The trial court also noted that under the new sentencing laws, that defendant could possibly be released after serving 20 years in the Illinois Department of Corrections. The trial court stated that while it was "not necessarily a big fan of a lot of the mandatory sentencing enhancements" based on the use of a firearm in the commission of an offense, in this case, imposition of the enhancement was "entirely appropriate."

¶ 213  Later, in reconsidering the sentence based on defendant's motion in which he alleged that his sentence was an unconstitutional *de facto* life sentence under the eighth amendment, the trial court observed:

"THE COURT: This was an individual, Mr. Miranda, that was over the age of 18 but under the age of 21 at the time of the offense, as I recall. And I did spend a great deal of time considering what an appropriate sentence would be considering it, trying to review as much as I could even before to the sentencing hearing, *per se*, by going over the relevant testimony that showed what the facts were which led to this conviction for first degree murder."

- 49 -

¶ 214   The trial court reiterated that the offense was premeditated, that the victim was "baited" by the Latin Kings, that defendant shot the victim in "cold-blood execution" style, "and he finished off when [the victim] was already on the ground suffering [an] earlier shotgun wound. It was close range, it was face to face, it's a[s] cold-blooded [a] murder as one could ever imagine."

¶ 215   The trial court again referenced the requirement that it "consider the ability of the defendant to consider risks and the consequences of his behavior." The trial court found that defendant:

"THE COURT: considered the risks and put himself in a position where he would not only be able to murder a young man but that he would be in a good position to get away with it. This was not some sort of rash act by an 18-year-old youth who didn't understand the consequences of his actions. This was someone who took the consequences of his actions and considered them in order to make sure that he could get away with the behavior that he engaged in."

¶ 216   The trial court also addressed defendant's statement in allocution where he said that he was subject to peer pressure. The court noted that defendant had a good family, and there was no evidence that someone in his family "indoctrinated him into this sort of life." Rather, defendant "chose to reject his own good family upbringing and join the Two[-]Sixers.[2] He embraced the Two[-]Sixers. He covered himself with gang tattoos, committed crimes."

¶ 217   The trial court again considered defendant's rehabilitative potential:

"THE COURT: I said there was nothing brought to the court's attention that showed his family or his home environment that there was any type of history of any parental neglect, there was no physical abuse, any other childhood drama

_____

[2] The trial court misspoke where the evidence conclusively established that defendant was a member of the Latin Kings street gang.

brought to the court's attention other than the fact that he claimed that he had been diagnosed as suffering from depression, I believe, at one point. And that as I pointed out earlier he had in fact been shot himself and the motivation for that would have been gang related as well.

His potential for rehabilitation and the evidence of his rehabilitation was, quite frankly, the evidence of it was nonexistent as best – or at best. As [defense counsel] had tried to point out, he had gone a good number of months at the end of his custodial period at Cook County Jail without picking up any new violations; but his history taken in total demonstrated a complete lack of potential for rehabilitation, at least at this stage."

¶ 218 The trial court reiterated that there was a 24-hour period "where the defendant showed some signs of potential for rehabilitation" after his arrest, but that such potential immediately dissipated.

¶ 219 Again, the trial court acknowledged that defendant "is actually going to have the opportunity to make a demonstration to the Department of Corrections that he can be rehabilitated" where he would be potentially eligible for release after serving 20 years of his sentence.

¶ 220 The trial court's extensive and detailed findings in imposing sentence establish that it considered and rejected the possibility that defendant should be sentenced as if he were a juvenile. The trial court's findings evince its full understanding of current law, including a youthful offender's ability to claim that a sentence in excess of 40 years could potentially be unconstitutional as applied to him under the proportionate penalties clause. After engaging in a detailed consideration of everything before it that could potentially bear on this question, the trial

court basically determined that defendant, while 19 years of age when this offense was committed, was not akin to a juvenile.

¶ 221   We conclude that defendant cannot establish that he was denied the effective assistance of counsel at sentencing under *Strickland* based on counsel's failure to claim that a *de facto* sentence would be unconstitutional as applied to him under the proportionate penalties clause of the Illinois Constitution.

¶ 222                    b. Ineffective Assistance of Counsel / Failure to Present Mitigation Evidence

¶ 223   We next address defendant's claim that trial counsel should have "marshaled mitigation evidence." Put simply, we are unaware of any mitigation evidence that defense counsel could have "marshaled" to obtain a different outcome. Defendant's claim lacks factual support.

¶ 224   Defense counsel faced an uphill battle and did what he could to mitigate the substantial evidence presented in aggravation. Defense counsel relied on the PSI to argue that defendant's actions resulted from growing up in a gang-infested neighborhood and being subject to peer pressure. Defense counsel argued,

> "DEFENSE COUNSEL: you can raise them, you can do your best, you can guide them you can give them the information. They step outside those walls the gangs take over ***. It doesn't matter how strong your family is, you don't have a choice. If you're going to survive from here to school, you don't have a choice."

¶ 225   Defense counsel argued that defendant had rehabilitative potential and had not committed any disciplinary violations in the year before being sentenced. Defense counsel noted the support of his family and asked the court to impose a minimum sentence.

¶ 226   The only "facts" relied on by defendant to support his contention are counsel's failure to call his mother to testify and failure to rely on the physical and emotional trauma suffered by

defendant due to being shot and witnessing the death of Vargas. Such alleged failings do not establish either deficient performance by counsel or resulting prejudice to defendant. In other words, they do not satisfy *Strickland*.

¶ 227   With respect to defense counsel's failure to call defendant's mother to testify as a mitigation witness, we find ample basis for concluding that this was a matter of strategy. If called as a mitigation witness, defendant's mother would surely have been questioned about the phone calls placed to her by defendant and Christian Garcia from Cook County Jail.

¶ 228   Defendant's claim that trial counsel should have relied on his prior injury and trauma both from being shot and witnessing his best friend's death also does not support his claim of ineffective assistance of counsel. As previously mentioned, the trial court considered these "facts" but did not regard them as mitigating. Additionally, the PSI rebuts the notion that defendant suffered lasting effects from being shot, where he reported having fully recovered six months later.

¶ 229   Furthermore, in imposing sentence, the trial court considered that defendant was diagnosed with depression. The PSI does not indicate whether the "depression" was related to the earlier gang shooting. However, the facts of this case support the trial court's conclusion that defendant's response to the prior incident was precisely what he indicated in his videotaped statement: the basis for him formulating a plan to exact revenge from a Two-Sixer.

¶ 230   In conclusion, the record in this matter fully supports the sentence imposed by the trial court and undermines any claim that defendant was denied the effective assistance of counsel under *Strickland*.

¶ 231                                        III. CONCLUSION

¶ 232   For the foregoing reasons, we affirm the judgment of the trial court.

¶ 233   Affirmed.